UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| HISTEEL CO., LTD., AND KUKJE STEEL CO., LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) Court No. 20-00146 |
| Defendant, | ) ) |
| and | ) ) |
| NUCOR TUBULAR PRODUCTS INC. AND ATLAS TUBE AND SEARING INDUSTRIES | ) ) ) |
| Defendant-Intervenors. | ) ) |

REPLY BRIEF OF
HISTEEL CO., LTD. AND KUKJE STEEL CO., LTD.


PUBLIC VERSION


PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES 20 AND 22




WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for HiSteel Co., Ltd.
  and Kukje Steel Co., Ltd.



April 13, 2021

Table of Contents

Page

ARGUMENT ............................................................................................................. 2

A.   As this Court Has Found Repeatedly, the Statute
Does Not Permit Commerce to Make a "PMS"
Adjustment for Purposes of the Sales-Below-Cost Test ...................... 2

B.   Commerce's Determination that a PMS Existed Due to
Distortions in the Korean Market for Hot-Rolled Steel
Coils Was Not Supported by Substantial Evidence ............................... 4

1.   As Commerce Admitted, Its Finding of a PMS in
the Second HWR Review Was Based on the Same
Facts as Its PMS Finding in the First HWR Review ................... 4

2.   Commerce's Findings with Respect to the Four
Individual Factors Considered in the PMS Analysis
Are Not Supported by Substantial Evidence ................................ 6

a.   Alleged Subsidies to Korean Steel Coil Producers .............. 6

b.   Alleged Strategic Alliances ................................................... 8

c.   Alleged Government Control of Electricity Prices .............. 9

d.   Alleged Impact of Chinese Imports on
Korean Prices for Hot-Rolled Coils ................................... 10

3.   Commerce's Invocation of the "Totality of the
Circumstances" Does Not Excuse It from Its Obligation
to Make a Reasoned Determination Based on Evidence ............ 11

C.   Commerce's Determination Ignored the Statutory Requirement
that, before a PMS Adjustment May Be Made, There Must Be
a Finding that "the Cost of Materials and Fabrication or
Other Processing of Any Kind Does Not Accurately Reflect
the Cost of Production in the Ordinary Course of Trade" .................. 13

D.   Commerce's Regression-Based PMS
Adjustment Is Not Reasonable or
Consistent with Substantial Evidence ................................................. 16

1.   The Weight of the Evidence Confirms that the
     Regression Model Used by Commerce Was Not a
     Reasonable Application of Econometric Analysis ...................................... 16

2.   Defendant's Assertion that Respondents' Failed to "Provide
     Detailed Regression Results" Demonstrating the Instability
     of Petitioners' Regression Model Is Not Supported by the
     Record or by the Commerce Determination They Cite ............................. 19

3.   Commerce Improperly Based Its Adjustment on Estimated
     Counterfactual Prices for 2017, Even though Two-Thirds
     of the Review Period Fell within 2018, when the
     Estimated Counterfactual Prices Were Much Lower ................................ 21

4.   Commerce's Failed to Use the Most Accurate
     Regression Results to Calculate the PMS Adjustment ............................. 23

CONCLUSION ................................................................................................... 26

Table of Authorities

Page

Court Decisions

*Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*,
    474 U.S. 361 (1986). ...................................................................................................... 4

*Borusan Mannesmann v. United States*,
    426 F. Supp. 3d 1395 (CIT 2020) ................................................................................. 3

*Dong-A Steel v. United States*,
    475 F. Supp. 3d 1317 (CIT 2020) .............................................................................. 3, 4

*Husteel v. United States*,
    426 F. Supp. 3d 1376 (CIT 2020) ............................................................................. 2, 12

*Hyundai Steel v. United States*,
    415 F.Supp.3d 1293, 1300 (CIT 2019) ....................................................................... 13

*NEXTEEL v. United States*,
    355 F.Supp.3d 1336 (CIT 2019) ................................................................................. 12

*Ningbo Dafa Chemical Fiber v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) .................................................................................. 23

*PSC VSMPO–Avisma Corp. v. United States*,
    688 F.3d 751 (Fed.Cir.2012) ...................................................................................... 17

*Saha Thai Steel Pipe v. United States*,
    422 F. Supp. 3d 1363 (CIT 2019) ................................................................................. 2

*Shakeproof v. United States*,
    268 F.3d 1376 (Fed. Cir. 2001) .................................................................................. 23

*Universal Camera Corp. v. National Labor Relations Board*,
    340 U.S. 474 (1951) ................................................................................................... 17

Administrative Determinations

*Carbon and Alloy Steel Cut-to-Length Plate from Korea*,
    86 Fed. Reg. 15184 (Mar. 22, 2021) ........................................................................... 11

*Cold-Rolled Steel Flat Products from Korea*,
    85 Fed. Reg. 38361 (June 26, 2020) ........................................................................... 11

*Cold-Rolled Steel Flat Products from Korea,*
    86 Fed. Reg. 7063 (Jan. 26, 2021) .............................................................................. 11

*Cut-to-Length Carbon-Quality Steel Plate from Korea,*
    85 Fed. Reg. 84296 (Dec. 28, 2020) ........................................................................... 11

*Hot-Rolled Steel Flat Products from Korea,*
    84 Fed. Reg. 2846, amended by 84 Fed. Reg. 35,604 (July 24, 2019) .......................... 7

*Hot-Rolled Steel Flat Products from the Republic of Korea,*
    81 Fed. Reg. 53439 (Aug. 12, 2016).............................................................................. 6

*Large Diameter Welded Pipe from Korea,*
    84 Fed. Reg. 6374 (Feb. 27, 2019).............................................................................. 18

STATUTES AND REGULATIONS

19 U.S.C. § 1677-1 .......................................................................................................... 7

19 U.S.C. § 1677b .............................................................................................. 2, 13, 15

BOOKS AND ARTICLES

T. Mills, ANALYSING ECONOMIC DATA: A CONCISE INTRODUCTION (2013) ..................... 17

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| HISTEEL CO., LTD. AND<br>KUKJE STEEL CO., LTD.,<br><br>               Plaintiffs,<br><br>           v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>           and<br><br>NUCOR TUBULAR PRODUCTS INC. AND<br>ATLAS TUBE AND SEARING INDUSTRIES<br><br>             Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 20-00146 |

REPLY BRIEF OF
HISTEEL CO., LTD. AND KUKJE STEEL CO., LTD.

      This reply brief is submitted on behalf of HiSteel Co., Ltd. ("HiSteel") and Kukje

Steel Co., Ltd. ("Kukje") (collectively, "Plaintiffs") in reply to the Response Briefs

submitted by Defendant and Defendant-Intervenors in the appeal of the final determination

by the U.S. Department of Commerce ("Commerce") in the second administrative review

of the antidumping order on Heavy Walled Rectangular Welded Carbon Steel Pipes and

Tubes ("HWR2") from the Republic of Korea.[1]

---

[1] *See* Defendant's Response to Plaintiff's Motion of Judgment on the Agency Record, March 16, 2021 ("Defendant's Rebuttal"). *See also* Nucor Tubular Products, Inc.'s Response to 56.2 Motion For Judgment upon the Agency Record, March 16, 2021

*(footnote continued on following page)*

<u>ARGUMENT</u>

A.  *As this Court Has Found Repeatedly, the Statute*
    *Does Not Permit Commerce to Make a "PMS"*
    *Adjustment for Purposes of the Sales-Below-Cost Test*

The statutory requirements concerning the calculation of constructed value are set forth in 19 U.S.C. § 1677b(e).  That provision explicitly permits Commerce to make an adjustment to *constructed value* when it finds that a particular market situation ("PMS") exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[2] Significantly, the authorization to make such a PMS adjustment is found only in the statutory provision concerning the calculation of constructed value.  There is no such authorization in the statutory provision concerning the calculation of cost of production for purposes of the sales-below-cost test (in 19 U.S.C. § 1677b(b)), and there also is no such authorization in the statutory provisions establishing common rules that apply to the calculation of *both* constructed value and cost of production (in 19 U.S.C. § 1677b(f)).

The plain language of the statute indicates, therefore, that a PMS adjustment may be made when calculating constructed value, but not when calculating cost of production for purposes of the sales-below-cost test.  In view of the clear statutory language, this Court has repeatedly held that Commerce is not permitted to make a PMS adjustment to cost for purposes of the sales-below-cost test.[3]

---

*(footnote continued from previous page)*
("Nucor's Rebuttal"); Defendant-Intervenors' Memorandum in Response to Plaintiffs' Motion For Judgment on the Agency Record, March 16, 2021 ("Atlas's Rebuttal").

[2] *See* 19 U.S.C. § 1677b(e).

[3] *See Saha Thai Steel Pipe v. United States,* 422 F. Supp. 3d 1363, 1371 (CIT 2019) (Judge Choe-Groves); *Husteel v. United States*, 426 F. Supp. 3d 1376, 1383–89 (CIT 2020)

*(footnote continued on following page)*

In their rebuttal briefs, Defendant and Defendant-Intervenors nevertheless ask the Court to overturn its own previous decision and the decisions by other judges of this Court and rule that Commerce has the authority to make PMS adjustments in the context of the sales-below-cost test. In this regard, they argue: (1) that the Court should defer to Commerce because statutory language is not clear as to whether such an adjustment is permitted,[4] (2) that Commerce is permitted to make such an adjustment pursuant to its discretion to use "'any' alternative cost calculation methodology if it determines that a 'particular market situation exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade,'"[5] and (3) that such adjustments are needed to effectuate the overall purpose of to address distortions associated an alleged PMS.[6] However, these arguments simply repeat contentions that were addressed and rejected in this Court's prior decisions.

For example, in the decision concerning the appeal of the first review of the heavy-walled rectangular pipe case ("HWR1"), the Court specifically found that "PMS determinations made under TPEA Section 504 do not authorize Commerce to make PMS adjustments outside the scope of a price-to-constructed value calculation."[7] The Court also found that Commerce's reliance on statutory language permitting the use of "any"

_____

*(footnote continued from previous page)*
(Judge Kelly); *Borusan Mannesmann v. United States*, 426 F. Supp. 3d 1395, 1411 (CIT 2020) (Judge Restani); *Dong-A Steel v. United States*, 475 F. Supp. 3d 1317, 1340 (CIT 2020) (Judge Katzmann).

[4] *See* Defendant's Rebuttal at 19-22. *See also*, Nucor's Rebuttal at 18-23.

[5] *See* Defendant's Rebuttal at 20; s*ee also*, Nucor's Rebuttal at 24-25 and Atlas's Rebuttal at 4-8.

[6] *See* Defendant's Rebuttal at 20; Nucor's Rebuttal at 18-23; and Atlas's Rebuttal at 11.

[7] *Dong-A Steel Company v. United States*, 475 F.Supp.3d 1317, 1340 (2020).

alternative cost calculation methodology is inapposite, because that language appears only in the statutory provision addressing the calculation of constructed value, and not in any of the statutory provisions addressing the calculation of cost for purposes of the sales-below-cost test.[8]  And, finally, the Court has rejected the suggestion that Commerce be permitted to make a PMS adjustment to cost for purposes of the sales-below-cost test in order to effectuate the purpose of the TPEA.[9]  As the Supreme Court has observed,

> Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.[10]

Neither Defendant nor Defendant-Intervenors have provided any new arguments for reversing this Court's extensive and comprehensive prior holdings on this issue.  In these circumstances, the Court should hold that Commerce acted unlawfully when it made a PMS adjustment to cost for purposes of analyzing whether the home-market sales were HiSteel and Kukje were below cost.

> B.   Commerce's Determination that a PMS Existed Due to Distortions in the Korean Market for Hot-Rolled Steel Coils Was Not Supported by Substantial Evidence

> 1.   As Commerce Admitted, Its Finding of a PMS in the Second HWR Review Was Based on the Same Facts as Its PMS Finding in the First HWR Review

In its final determination, Commerce explicitly stated that its assessment of the alleged PMS affecting steel input costs in the review that is the subject of this appeal was directly based on its finding in the first administrative review of this case ("HWR1").  As

---

[8] *Id.* at 1339.

[9] *Id.*

[10] *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986).

Commerce explained, "the circumstances present during the instant review remained largely unchanged from those in the 2016-2017 POR which led to the finding of a PMS in Korea in HWR from Korea 2016-2017 Final Results."[11]

Furthermore, Commerce's determination in the first review of the HWR case was explicitly grounded in its finding of a PMS in previous reviews of other antidumping orders on Korean pipe products, including review of Oil Country Tubular Goods ("OCTG"), Circular Welded Pipe ("CWP"), and Welded Line Pipe ("WLP").[12]  In short, Commerce's determination at issue in this appeal is based on the same evidence and logic that Commerce relied upon in previous reviews involving HWR, OCTG, CWP, and WLP from Korea.  And, as this Court is aware, Commerce's findings of a PMS in those reviews based on the same evidence and logic have been consistently rejected by this Court.

Defendant nevertheless claims that the record in this proceeding is "more expansive" than in HWR1 and suggests that Commerce's PMS determination can be justified based on the existence of more expansive record here.[13]  That claim is, however, contrary to Commerce's own statement that "the circumstances present during the instant review

---

[11] Issues and Decision Memorandum for the Preliminary Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea (Nov. 6, 2019), at 14-15 (hereinafter "Preliminary Decision Memo") (Public Record ("PR") 342).  *See also* Issues and Decision Memorandum for the Final Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, at 15 (July 6, 2020) (hereinafter *"*Final I&D Memo") (PR-395); Plaintiffs' Initial Brief at 8-9.

[12] *See* Issues and Decision Memorandum for the Final Results of the 2016-2017 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea (May 20, 2019), at 12-13.  *See also* Plaintiffs' Initial Brief at 9.

[13] Defendant's Rebuttal at 17

remained largely unchanged from those in the 2016-2017 POR which led to the finding of

a PMS in Korea in HWR from Korea 2016-2017 Final Results."[14]  Significantly,

Defendant has not identified any "new" information or evidence in this review that fills the

evidentiary deficiencies that were found in HWR1.  In these circumstances, the Court

should reach the same conclusion it reached in the appeal of HWR1 (and in the appeals of

the reviews of OCTG, CWP, and WLP from Korea), and find that Commerce's finding

that a PMS existed with respect to hot-rolled coil ("HRC") prices in Korea is not

supported by substantial evidence.

> 2.  *Commerce's Findings with Respect to the Four*
> *Individual Factors Considered in the PMS Analysis*
> *Are Not Supported by Substantial Evidence*

> > a.  *Alleged Subsidies to Korean Steel Coil Producers*

Commerce's PMS findings in prior reviews were based, in part, on its earlier

determination that the Korean steel coil producer POSCO received countervailable

subsidies of 58.68 percent.  However, that rate was based on the application of total

adverse facts available to POSCO in an investigation that examined the 2014 calendar

year.[15]  But the subsidy rate from the original Hot-Rolled Coil investigation has now been

superseded.  In its first review of the countervailing duty order on Hot-Rolled Coil (which

was based on information submitted by POSCO for its 2016 fiscal year, and not on total

adverse facts available), Commerce found that POSCO's subsidy rate was only 0.54

---

[14] Preliminary Decision Memo, at 14-15 (PR-342).

[15] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea,* 81 Fed. Reg.
53439 (Aug. 12, 2016), and accompanying I&D Memo at 7 (Aug. 4, 2016).

percent.[16]  The subsidy rate in that review for the other Korean steel producer (Hyundai Steel) was found to be only 0.58 percent.[17]

Defendant suggests that Commerce's PMS finding properly relied on the existence of these tiny subsidies to POSCO, because "these subsidies are *present* and part of the cumulative effect that Commerce found existed as a particular market situation."[18] Moreover, Defendant declared that "in determining whether a particular market situation exists, Commerce is not required to measure the downstream benefit of subsidies to a particular company or companies because Commerce is examining the impact on the market of HRC as {a} *whole*, not the impact on each producer."[19]

In this case, however, Commerce failed to examine (let alone prove) the impact of such subsidies on the market of HRC as a whole.  Moreover, beyond noting the *existence* of subsidies, Commerce did not identify any evidence that the very small subsidies to POSCO actually affected the price of hot-rolled coils in the Korean market.  In this regard, it is worth noting that the provisions of the countervailing duty statute concerning upstream subsidies do not permit Commerce to assume that upstream subsidies affect downstream prices.  Instead, there must be a finding (based on evidence) of a competitive benefit to the downstream producer.[20]  Tellingly, Defendant does not identify any statutory authority that allows Commerce to assume a competitive benefit from upstream subsidies for purposes of

---

[16] *See Certain Hot-Rolled Steel Flat Products from Korea,* 84 Fed. Reg. 28461 (June 19, 2019) as amended by 84 Fed. Reg. 35,604 (July 24, 2019).

[17] *Id.*

[18] Defendant's Rebuttal at 10 (citing Final I&D Memo at 15, 19) (emphasis added).

[19] *Id*. (citing Final I&D Memo at 19).

[20] *See* 19 U.S.C. § 1677-1(b)(1).

a PMS determination, when the statute expressly forbids such an assumption in countervailing duty cases.

> ### b.   Alleged Strategic Alliances

As explained in our initial brief, Commerce's finding of strategic alliances in this case was based on a single incident in which Korean producers (not including HiSteel and Kukje) of a different product (line pipe) were found to have engaged in bid-rigging on sales to a Korean government agency prior to January 2013.  There was no evidence of bid-rigging (or any other strategic alliances) involving HiSteel or Kukje, the Korean producers of hot-rolled coils, or the current review period.[21]

Significantly, neither Defendant nor Defendant-Intervenors disputes this characterization of the evidence relied upon by Commerce.  Instead, they claim that the pre-2013 conduct involving different companies and a different product is relevant because "strategic alliances in the past may affect the future."[22]  But even if that assertion were correct, it would mean, at most, that there might be a risk that Korean producers of line pipe (not including HiSteel or Kukje) might collude again at some time in the future.  It is not evidence that the different Korean companies that produce hot-rolled coil engaged in strategic alliances with HiSteel or Kukje or any other Korean producers of HWR to manipulate hot-rolled coil prices.  The suggestion that the behavior of all Korean companies may be generalized from a single incident involving different companies and a different product is a racist smear, not a reasoned conclusion based on substantial evidence.

---

[21] See Plaintiffs' Initial Brief at 15-16.

[22] See Defendant's Rebuttal at 12.

### c. Alleged Government Control of Electricity Prices

As explained in our initial brief, Commerce has repeatedly examined claims that the Korea government provided subsidies to Korean industrial companies through the state-owned electricity company.  It has also repeatedly found that Korean electricity prices do not confer any subsidy benefit to industrial electricity users.[23]  Despite those repeated findings, Commerce concluded in this case that "{e}vidence on the record of this review demonstrates that electricity rates were being subsidized … {and} … that there is distortion present in the Korean electricity market."[24]  However, Commerce made no findings as to how or whether the allegedly subsidized electricity prices were "passed through" from Korean hot-rolled coil producers to their downstream customers.  Indeed, Commerce itself admitted that it had no evidence that Korean producers of hot-rolled coils or HWR actually received electricity at subsidized rates during the review period.[25]

Tellingly, neither Defendant nor Defendant-Intervenors have identified any evidence that the allegedly subsidized electricity prices affected hot-rolled coil prices in the Korean market.  Instead, they suggest that Commerce is permitted to assume that upstream subsidies automatically confer a competitive benefit on downstream customers even though (as discussed above) the countervailing duty statute expressly forbids any such assumption and even though there is no evidence of subsidies to producers of the upstream hot-rolled coils in this case.  That argument cannot be reconciled, however, with the

---

[23] *See* Plaintiff's Initial Brief at 17.

[24] Final I&D Memo at 17 (PR-395).

[25] *Id.*

statutory standard of review, which requires that Commerce's factual determinations be supported by substantial evidence.

> d.  *Alleged Impact of Chinese Imports on*
> *Korean Prices for Hot-Rolled Coils*

Commerce's PMS determination concluded that there was steel overcapacity in China, that Korea was a leading destination for Chinese exports of hot-rolled steel, and that import prices of HRC from China were generally lower than they were from the rest of the world.[26]  Based on these circumstances, Commerce concluded that Chinese imports put downward pressure on Korean hot-rolled coil prices, which resulted in a distortion in those prices.[27]

However, as noted in our initial brief, the evidence actually showed that Korean steel prices were 22 percent higher in 2017 than in 2016, and even higher in 2018.[28]  This evidence is, in itself, a complete refutation of Commerce's assumption that Korean steel prices must have been falling due to increased Chinese imports.  And, other evidence also refuted Commerce's assumption that Korean hot-rolled coil producers were being harmed by the allegedly low-priced Chinese imports:  In fact, the Korean hot-rolled-coil producer POSCO reported increasing gross profits and operating profits in every year from 2014 to 2018 — despite fluctuations in Chinese and global capacity utilization over that period.[29]

Defendant attempts to explain away this evidence by asserting that the improving financial results for Korean hot-rolled coil producers were a consequence of Korean

---

[26]*Id.*

[27] *Id.*

[28] *See* Plaintiffs' Initial Brief at 19-20.

[29] *Id.*

government subsidies.[30]  But they have not explained how the tiny amount of subsidies at issue (which were found to be just above *de minimis* for POSCO and Hyundai Steel) would have caused Korean steel *prices* to increase from 2016 to 2018.  They also have not explained how the tiny amount of subsidies could have resulted in *increasing* profits for Korean steel producers — especially when Commerce's more recent reviews have not found any increases in the subsidies to Hyundai Steel or POSCO.[31]  Instead, their argument is, like Commerce's determination, based entirely on speculation that the allegedly large volume of imports from China into Korea *might* have distorted Korean hot-rolled-coil prices.  Such speculation is not substantial evidence, and it does not provide a basis for upholding Commerce's determination.

      3.   *Commerce's Invocation of the "Totality of the Circumstances" Does Not Excuse It from Its Obligation to Make a Reasoned Determination Based on Evidence*

In the absence of any evidence that the factors identified by Commerce actually affected hot-rolled coil prices in Korea, Defendant and Defendant-Intervenors contend that Commerce's PMS finding should still be upheld because Commerce relied not on any

---

[30] *See* Defendant's Rebuttal at 12.

[31] In its recent determinations involving cold-rolled coils, Commerce has found overall subsidies of 0.45 and 0.51 percent for Hyundai for the 2017 and 2018 reviews and overall subsidies of 0.59 percent for POSCO for the 2017 review.  *See Cold-Rolled Steel Flat Products from Korea*, 85 Fed. Reg. 38361 (June 26, 2020) (2017 Review Period); *Cold-Rolled Steel Flat Products from Korea,* 86 Fed. Reg. 7063 (Jan. 26, 2021) (2018 Review Period Preliminary Results).  In its recent determination involving cut-to-length steel plate, Commerce has found overall subsidies of 0.50 percent for Hyundai and 0.49 percent for POSCO.  *See Cut-to-Length Carbon-Quality Steel Plate from Korea*, 85 Fed. Reg. 84296 (Dec. 28, 2020) (2018 Review Period); *Carbon and Alloy Steel Cut-to-Length Plate from Korea,* 86 Fed. Reg. 15184 (Mar. 22, 2021) (2018 Review Period).

individual factor, but on the "totality of the circumstances" analysis.[32]  In their view, the

phrase "totality of the circumstances" is a magical phrase — the legal equivalent of

*abracadabra* — that transforms leaden arguments into gold.  But the law does not permit

that result.

This Court has acknowledged that reliance on cumulative effects of multiple factors to

assess a PMS may be "reasonable in theory."[33]  However, the Court has emphasized that

an assessment of those cumulative effects must be grounded in actual evidence.  As the

Court has explained,

> Although Commerce may rely on the cumulative effect of multiple
> distortions to arrive at a PMS determination, *it cannot use that phrase*
> *to circumvent a meaningful review of the sufficiency of the record*.[34]

In this case, there is no evidence that the four factors identified by Commerce worked

together to distort Korean prices for hot-rolled coils.  There is no evidence, for example,

that Korean producers of hot-rolled coils banded together with one another or with Korean

pipe producers to lower Korean prices for hot-rolled coils in response to Chinese imports.

There is no evidence that the Korean coil producers lowered their prices as a result of the

tiny Korean government subsidies identified by Commerce or that those tiny subsidies

represented a response to an alleged global steel crisis.  There is no evidence that the

government-owned Korean electricity supplier modified its electricity rates during the

current review period to allow Korean hot-rolled coil producers to compete with Chinese

---

[32] See Defendant's Rebuttal at 15-16; *see also*, Nucor's Rebuttal at 30-31 and Atlas's
Rebuttal at 17-19.

[33] *NEXTEEL v. United States*, 355 F.Supp.3d 1336, 1349 (CIT 2019).

[34] *Husteel*, 426 F.Supp.3d at 1391-92.

imports or that any electricity savings were passed through by the hot-rolled coil producers to their downstream customers.

As this Court has previously found, Commerce's finding of a PMS involving Korean hot-rolled coil prices lacks persuasive evidence on any of the four factors constitutes an "evidentiary void" that cannot be filled simply by talismanically invoking the "totality of the circumstances."[35]  Neither Commerce, Defendant, nor Defendant-Intervenor have offered any basis for the Court to reach a different result in this case.

> C.   *Commerce's Determination Ignored the Statutory Requirement*
> *that, before a PMS Adjustment May Be Made, There Must Be*
> *a Finding that "the Cost of Materials and Fabrication or*
> *Other Processing of Any Kind Does Not Accurately Reflect*
> *the Cost of Production in the Ordinary Course of Trade"*

As mentioned, the statutory provisions concerning the calculation of constructed value authorize an adjustment when "a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[36]  By its terms, that language does not permit an adjustment to constructed value for generalized "distortions" in input prices. Instead, an adjustment is permitted only when the distortions result in a situation in which

---

[35] As the Court has explained,

> The court also rejects Wheatland's contention that under a totality of the circumstances approach, Commerce can demonstrate the existence of a particular market situation based upon the combination of Korean hot-rolled coil subsidies, imports from China, strategic alliances, and electricity pricing interference, even though there is a lack of persuasive evidence to support any one of these allegations. … *Not even their collective impact can fill the evidentiary void that has plagued Commerce's particular market situation finding through the OCTG reviews and now this review.*

*Hyundai Steel v. United States*, 415 F.Supp.3d 1293, 1300 (CIT 2019) (emphasis added).

[36] 19 U.S.C. § 1677b(e) (emphasis added).

the cost of the inputs "does not accurately reflect the cost of production in the ordinary course of trade."

As discussed in our initial brief, Commerce's determination in this review found that prices for hot-rolled coils were distorted. However, it made no finding whether those distorted prices accurately reflected the cost of production for hot-rolled coils in the ordinary course of trade. It made no finding whether the individual prices paid by HiSteel and Kukje for hot-rolled coils were below the cost of production of those coils. And, it made no finding as to whether the Korean prices for hot-rolled coils in general were below the cost of production of those coils. Instead, Commerce simply ignored the explicit statutory language requiring some finding that the input prices did "not accurately reflect the cost of production in the ordinary course of trade" before an adjustment to constructed value would be permitted. As a result, even if Commerce's finding that prices were "distorted" had been supported by substantial evidence, its decision to adjust the costs for HiSteel and Kukje would still have been contrary to the statutory requirements.

Defendant suggests that Commerce is not required to determine whether prices for the product for which a PMS has been alleged reflect the cost of producing that product because "the plain language of the statute does not require Commerce to analyze whether individual costs are in the ordinary course of trade"[37] and "{i}f a market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs."[38] As explained below, however, neither of these arguments relieves Commerce from the statutory

---

[37] Defendant's Rebuttal at 18.

[38] *Id.*

requirement to determine whether HRC prices accurately reflected the cost of production

of HRC in the ordinary course of trade before a PMS adjustment to Plaintiffs' costs.

Defendant asserts that Commerce's determination should nevertheless be affirmed

because the "the plain language of the statute does not require Commerce to analyze

whether individual costs are in the ordinary course of trade"[39]   In this regard, Defendant

argues that, "{i}f a market is distorted as a whole, it would be illogical to conclude that one

company operating in that particular market is insulated from the market distortions with

respect to costs."

In our view, Defendant's proposed interpretation cannot be reconciled with the

language of the statute.[40]   But the Court need not resolve that issue.  Whether the statute

requires an individualized analysis for each respondent or instead permits an overall

analysis of the market as a whole, a finding that a market is "distorted" is not, by itself,

sufficient to trigger the statutory authority to adjust constructed value.  Instead, the statute

only permits an adjustment to constructed value when there is a finding that a "particular

market situation exists such that" the price for the input in question "does not accurately

reflect the cost of production in the ordinary course of trade."  This language clearly

_____

[39] *Id.*

[40] Paragraph (1) of the constructed-value provision (19 U.S.C. § 1677b(e)) refers to the "cost of materials and fabrication or other processing of any kind *employed in producing the merchandise.*"  We are not aware of any case involving a market-economy producer in which Commerce has argued that constructed value should be based on the "cost of materials and fabrication or other processing of any kind" for someone other than the actual producer of the merchandise.  And, the addenda to the constructed value provision permitting an adjustment for a "particular market situation" states specifically that the adjustment is made "{f}or purposes of paragraph (1) …"  It is clear, therefore, that the analysis of the effect of the "particular market situation" on costs must be made for the same costs identified in paragraph (1) of 19 U.S.C. § 1677b(e) — which are the costs incurred by the actual producer to produce the specific merchandise under examination.

contemplates that there may be "particular market situations" for which no adjustment is permitted (because, notwithstanding the PMS, the input prices *do* reflect the cost of production of the input in the ordinary course of trade).  In order to adjust constructed value under the statute, Commerce must first find (on some basis) that the prices for the inputs did not reflect their cost of production.  Since Commerce made no finding on that issue (either on an individualized or overall basis), it failed to satisfy the statutory requirement and its determination cannot be upheld.

> D.  *Commerce's Regression-Based PMS Adjustment Is Not Reasonable or Consistent with Substantial Evidence*
>
> 1.  *The Weight of the Evidence Confirms that the Regression Model Used by Commerce Was Not a Reasonable Application of Econometric Analysis*

Commerce's calculation of the adjustment to the reported costs for HiSteel and Kukje was based on the application of a regression model which purported to identify the relationship between "uneconomic steel capacity" and hot-rolled coil prices.  As noted in our initial brief, the record in this case includes a report by Michael Northeim, an expert in data analytics, addressing the regression model relied upon by Commerce.  Mr. Northeim's report concluded (1) that the regression model used by Commerce "does not generate stable results," (2) that the specific model used by Commerce was "an outlier" among the observed set of unstable estimates, and (3) that the model therefore lacked "predictive power."[41]

---

[41] *See, e.g.*, Michael Northeim, "Investigating the Validity of OLS For Predicting AUV: 2008 – 2017 Korea Import AUV," at 11 (provided in Appendix 9 of HiSteel's June 24, 2020, Submission) (hereinafter, "Northeim Report") (PR-391-394, CR-210-214).

In response, Defendant asserts that this expert report is not "dispositive" because Commerce "relied on its own extensive expertise and conducted an independent assessment."[42]  However, that argument misrepresents the standard of review and, furthermore, is unsupported by any evidence on the record.

As the Court is undoubtedly aware, an expert opinion is never "dispositive" on its own.  Instead, an "expert opinion" is evidence relevant to the assessment of factual issues.[43]  And, in evaluating whether a determination is supported by substantial evidence, the expert opinion must be weighed, as evidence, against the competing evidence on the record.[44]

In this case, Commerce was faced with a factual issue — in particular, whether the regression model proposed by Wiley Rein on behalf of petitioners could properly be used to estimate what hot-rolled coil prices would have been in the absence of the alleged excess global steel production capacity.  Commerce had before it a report from Mr. Northeim explaining why Wiley Rein's model was not suitable for that purpose.  That report also established Mr. Northeim's credentials as an expert on issues of data analysis. Beyond that, there was no factual information on the record suggesting that Mr. Northeim might be wrong.[45]  In such circumstances, the only *evidence* on the record was

---

[42] *See* Defendant's Rebuttal at 25.

[43] *See, e.g.*, *PSC VSMPO–Avisma Corp. v. United States,* 688 F.3d 751, 760–61 (Fed.Cir.2012) (internal quotations omitted).

[44] *See, e.g.*, *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 488 (1951) ("The substantiality of evidence must fairly take into account whatever in the record detracts from its weight.").

[45] To the contrary, there was evidence that Mr. Northeim's concerns about the instability of the results generated by petitioners' regression model was supported by academic materials included in the record.  *See* T. Mills, ANALYSING ECONOMIC DATA: A CONCISE

*(footnote continued on following page)*

PUBLIC VERSION

Mr. Northeim's report.  Commerce's insistence on relying on Wiley Rein's model in the face of that unrefuted evidence was unlawful.

Defendant asserts that Commerce was permitted to disregard Mr. Northeim's expert opinion and instead rely on its own expertise.  But there is no evidence on the record, and no reason to believe, that the Enforcement and Compliance agency within Commerce has *any* expertise in the use of regression models to prediction hypothetical steel prices under counterfactual assumptions regarding steel capacity utilization.  It may well be that the Enforcement and Compliance agency can be presumed to be an expert in the legal and accounting issues that arise in connection with its administration of the antidumping statute.  But nothing in the antidumping statute mandates the use of a regression analysis to predict steel prices.  And, before 2018, when Wiley Rein first proposed that a regression model be used to calculate a PMS adjustment,[46] Enforcement and Compliance had never (to the best of our knowledge) employed a similar analysis for any purpose in any case.

Significantly, the record does not contain any memorandum or other supporting documents from any Commerce officials that claim to have expertise in matters of data analysis addressing the concerns raised by the Northeim report.  The only document discussing issues relating to the regression model is Commerce's final decision

---

*(footnote continued from previous page)*
INTRODUCTION (2013), at 244 (provided in Appendix 10-F of HiSteel's June 24, 2020, submission) ("An implicit assumption in all regression models is that their coefficients remain constant across all observations. Particularly with time series data, this may not necessarily be the case, since coefficients can 'evolve' through time, or indeed alter abruptly at a point in time, in many different ways. This is known as the problem of structural change, which has a tendency to pervade many attempts at modelling economic data.") (PR-391-394, CR-210-214).

[46] *See Large Diameter Welded Pipe from Korea*, 84 Fed. Reg. 6374 (Feb. 27, 2019), and accompanying I&D Memo at Comment 2.

memorandum prepared by the Deputy Assistant Secretary and approved by the Assistant

Secretary for Enforcement and Compliance.  Significantly, that memorandum *does not*

*even address* the fact that the regression model proposed by petitioners fails validation

because it generates unstable results, even though that issue was expressly raised in at least

one respondent's case brief.[47]  In such circumstances, Defendant's claims that Commerce

evaluated Mr. Northeim's concerns and that Commerce rejected those concerns based on

Commerce's own expertise is unsupported by the record.

> 2. *Defendant's Assertion that Respondents' Failed to "Provide*
>    *Detailed Regression Results" Demonstrating the Instability*
>    *of Petitioners' Regression Model Is Not Supported by the*
>    *Record or by the Commerce Determination They Cite*

As a fundamental matter, the regression model adopted by Commerce is based on the

premise that there is a consistent relationship between steel prices and the purported

"explanatory" variables (such as uneconomic capacity and iron ore prices).  After all, if

those relationships are not stable, it is not possible to use them to predict how prices would

have reacted to changes in the explanatory variable, because there would be no basis for

assuming that the relationships that existed in the past correctly described the relationships

that exist in the present.

In this case, the data demonstrates conclusively that the relationships between steel

prices and the purported "explanatory" variables were not stable over time.  Instead, the

coefficients for key variables in the model (such as Uneconomic Capacity and Iron Ore)

vary both in magnitude *and in sign* when calculated for different time-periods.  In our

initial brief, we provided the following summary of the variations in the coefficients for

---

[47] *See* HiSteel's January 8, 2020, Case Brief at 32-33 (provided in Appendix 1 of HiSteel's
June 24, 2020, Submission) (PR-391-394, CR-210-214).

two key variables — uneconomic capacity and iron ore prices — when analyzed over

different time periods.[48]

| Regression Period | Uneconomic Capacity Coefficient | Iron Ore Price Coefficient |
|---|---|---|
| 2008-12 | | |
| 2009-13 | | |
| 2010-14 | | |
| 2011-15 | | |
| 2012-16 | | |
| 2013-17 | | |

According to these results, when Wiley Rein's model is run using the data for the

2008-to-2012 and 2009-2013 periods, the coefficients indicate that a small *increase* in

capacity utilization would have massively *increased* steel prices, while a small *increase* in

iron ore prices would have massively *reduced* steel prices.  By contrast, when Wiley

Rein's model is run using the data for the 2010-to-2014 and 2011-2015 periods, the

coefficients indicate that a small *increase* in capacity utilization would have slightly

*reduced* steel prices, while a small *increase* in iron ore prices would have resulted in a

slight *increase* in reduced steel prices.  And, when Wiley Rein's model is run using the

data for the 2012-to-2016 and 2013-2017 periods, the coefficients indicate that a small

*increase* in capacity utilization or iron ore prices would result in a slight *increase* in steel

prices.

Defendant attempts to wave away these problems by claiming that "Commerce

determined that HiSteel and Kukje did not provide detailed regression results to

---

[48] *See* Northeim Report at 11 (PR391-394, CR210-214).

meaningfully substantiate its 'analysis.'"[49]  That claim is false:  Although Defendant

asserts that Commerce made such a finding on pages 36 to 37 of its final "issues and

decision memorandum," nothing on those pages even addresses our arguments about the

instability of the regression results over shorter time periods.  And, contrary to Defendant's

claim, detailed regression results for each of the time periods were provided in the

Northeim report.[50]  Obviously, Defendant's reliance on falsehoods to justify Commerce's

failure to address a fundamental flaw in Commerce's analysis does not provide any basis

for upholding Commerce's decision.

> 3.  *Commerce Improperly Based Its Adjustment on Estimated*
> *Counterfactual Prices for 2017, Even though Two-Thirds*
> *of the Review Period Fell within 2018, when the*
> *Estimated Counterfactual Prices Were Much Lower*

As noted in our initial brief, Commerce's calculation of the PMS adjustment was

based on the difference between actual steel prices (as measured by average unit import

values) for calendar year 2017 and Commerce's estimates of what 2017 prices would have

been at a counterfactual level of global capacity utilization.  Commerce had all of the

information needed to estimate what 2018 prices would have been using the same

regression model and regression results.  However, Commerce chose not to use the

difference between actual 2018 prices and the estimated counterfactual 2018 prices in

calculating the adjustment, even though eight of the 12 months of the review period fell

within 2018.

---

[49] *See* Defendant's Rebuttal at 28.

[50] *See* Northeim Report at 7-12 (reporting detailed regression results for 2008-12, 2009-13, 2010-14, 2011-15, 2012-16, and 2013-17 periods) (PR391-394, CR210-214).

Defendant attempts to excuse Commerce's failure to consider two-thirds of the review period because it claims that steel purchased in 2018 might have been used after the review period, and thus not relate to the cost of producing HWR during the review period.[51]  But that logic cuts even more against the "2017-only" analysis used by Commerce.  Given that the review period covered only the last four months of 2017, the vast majority of the steel purchased by HiSteel and Kukje in 2017 would have been consumed prior to the start of the review period.[52]

Defendant also asserts that Commerce properly excluded 2018 data from its regression analysis because regression analysis is "retrospective" in nature.[53]  But that claim conflates the data used to generate regression coefficients with the time period for which an estimate was to be prepared.  As a mathematical matter, it is entirely possible to generate regression coefficients by analyzing data that only extends to 2017, but then to use those coefficients to predict what 2018 prices would be.  Of course, if the coefficients are stable over time, it should not matter whether data ending in 2017 or 2018 is used to generate them.  And, if the coefficients are not stable over time, there is no reason to expect that coefficients derived for a period ending in 2017 would accurately predict steel

---

[51] *See* Defendant's Rebuttal at 29.

[52] In this regard, it should be noted that the information on the record indicates that HiSteel held, on average, enough hot-rolled coil in inventory to supply less than one month of production.  *See* HiSteel's February 27, 2019, Section D Response, Appendix D-3-A (reporting average hot-rolled coil inventory of [     ] metric tons and average consumption of [     ] metric tons per month) (PR-35-37, CR-11-15).  Thus, steel purchased by HiSteel between January and July of 2017 would have been used up by the end of August 2017.  *See also* Kukje's July 9, 2019, Section D Supplemental Response, Appendix SD-1 (reporting average hot-rolled coil inventory of [     ] metric tons and average consumption of [     ] metric tons per month) (PR-288, CR-158).

[53] *See* Defendant's Rebuttal at 29.

prices for a review period covering eight months of 2018 (and only four months of 2017).

Commerce's failure to consider the estimated prices for 2018 (and the extent to which its

regression model could reasonably predict those prices) further demonstrates the

fundamental illogic of Commerce's methodology.

### 4. Commerce's Failed to Use the Most Accurate Regression Results to Calculate the PMS Adjustment

Under the antidumping statute, Commerce's fundamental obligation is to ensure that

its "establishes antidumping margins as accurately as possible."[54]  Consequently, to the

extent that Commerce was permitted to rely on a regression analysis to calculate a PMS

adjustment in this case, Commerce was required to select a model that generated the most

accurate results.

As indicated in our initial brief, normal statistical measures indicate that the

coefficients generated by an analysis of the more recent periods — and, in particular, the

coefficients generated by analysis of the 2013-17 data — are more accurate than those

generated for the full ten-year 2008-17 period.[55]  Accordingly, in the event that Commerce

is not prevented from relying on this regression model on remand, the goal of accuracy is

best served by using the data for the period from 2013 to 2017 in calculating its PMS

adjustment on remand.

Defendant claims that Commerce should be permitted to rely on the less accurate

coefficients generated by analysis of the full ten-year 2008-17 period.  According to

Defendant, the ten-year period is consistent with Commerce's methodology in a review of

---

[54] See, e.g., Ningbo Dafa Chemical Fiber v. United States, 580 F.3d 1247, 1257 (Fed. Cir. 2009); Shakeproof v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

[55] See HiSteel's January 8, 2020, Case Brief at 34 (provided in Appendix 1 of HiSteel's June 24, 2020, Submission) (PR391-394, CR210-214).

Circular Welded Pipe from India.  In addition, Defendant claims (quoting Commerce) that "a period of ten years allows for an adequate amount of data and ensures consistency of the regression analysis from one proceeding to another."  Furthermore, Defendant also claims (again quoting Commerce) that "ten years is 'an appropriate length of time for quantification of the effect of overcapacity on steel prices."[56]  And, finally, Defendant asserts (quoting Commerce) that the ten-year period is needed to capture the effects of the 2008-09 financial crisis, which, it claims, "is the main event of interest in the analysis."[57]  According to Defendant, our suggestion that a more recent five-year period be used is simply "cherry picking."

But none of these arguments addresses the core issue before Commerce, which is to establish "antidumping margins as accurately as possible."  Consistency with the analysis applied in a case involving a different product (Circular Welded Pipe) from a different country (India) says nothing about the accuracy of Commerce's methodology for estimating what steel costs would be for Korea producers of HWR.  Furthermore, Commerce has not explained why the results provided by using ten years of data are more accurate than the results provided by using only five years.  As demonstrated above, Commerce's own model demonstrates that the relationship between steel prices and global excess capacity was very different in 2008 and 2009 than it was in later years.  Consequently, as Mr. Northeim explained in his expert report, inclusion of 2008 and 2009 is more likely to distort the results than to improve them.

---

[56] *See* Defendant's Rebuttal at 29.

[57] *Id.* at 30.

By the same token, Commerce's assertion that the financial crisis of 2008 and 2009 is "the main event of interest" misstates the relevant inquiry.  Commerce was not tasked in this case with predicting what prices would have been if that financial crisis had not occurred.  Instead, its task was to calculate dumping margins for the 2017-18 review period as accurately as possible.

As noted in our initial brief, the normal statistical tests used to measure the accuracy of a regression model indicate that the coefficients calculated based on the five-year 2013-17 period are more accurate than the coefficients calculated based on the ten-year 2008-2017 data.[58]  Commerce's final determination never addressed that evidence, and it never attempted to explain why the normal statistical tests for accuracy would be misleading in this case.  In these circumstances, Commerce's insistence on using coefficients from the less accurate ten-year model cannot be sustained.

---

[58] *See* HiSteel's January 8, 2020, Case Brief at 34 (provided in Appendix 1 of HiSteel's June 24, 2020, Submission) (PR391-394, CR210-214).

PUBLIC VERSION

## Conclusion

For the foregoing reasons, we respectfully request that the Court grant Plaintiffs'

motion for judgment on the agency record, and remand this matter to Commerce for

disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Michael J. Chapman
Amrietha Nellan
Vi N. Mai

Winton & Chapman PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for HiSteel Co., Ltd.
  and Kukje Steel Co., Ltd.

April 13, 2021

Certificate of Compliance

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,954 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

/s/Jeffrey M. Winton

April 13, 2021