# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|   |   |
|---|---|
| HISTEEL CO., LTD, and KUKJE STEEL CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC., and ATLAS TUBE, and SEARING INDUSTRIES, <br><br> Defendant-Intervenors. | Court No. 20-00146 |

## DEFENDANT'S RESPONSE TO THE COURT'S QUESTIONS

Defendant, the United States, respectfully submits this response to the Court's questions in advance of oral argument, ECF No. 49.

## II. Questions to the Government and Defendant-Intervenors

1. How do you respond to Plaintiffs' argument that Commerce does not have statutory authority to apply a PMS adjustment here in part because 19 U.S.C. § 1677b(f) sets out "special rules" for conducting a sales-below-cost test but does not mention PMS adjustments? Pls.' Mot. for J. on the Agency R. at 6–7, Jan. 4, 2021, ECF No. 33 ("Pls.' Br."). Can your proposed interpretation of 19 U.S.C. § 1677b(f) be reconciled with the court's prior decisions, or would it require the court to depart from its previous determinations?

The statute requires Commerce in antidumping proceedings to determine normal value based on the rules set forth in 19 U.S.C. § 1677b to achieve a "fair comparison" between normal value and export price. 19 U.S.C. § 1677b(a). The statute in its basic definition of normal value

(not just constructed value) requires that normal value reflect a price that is in the "ordinary course of trade." *Id.* § 1677b(a)(1)(B)(i). This carries through to the subsection (b) normal value provisions concerning sales below cost. *Id.* §§ 1677b(b)(1), (3) ((subsection (b)(3) uses the similar term "ordinary course of business"). Moreover, the TPEA generally expanded the meaning of "ordinary course of trade" to include any situation in which Commerce finds that a particular market situation prevents a proper comparison between markets. *See id.* § 1677(15)(C) (Commerce "shall consider" such transactions outside ordinary course of trade). It also authorizes Commerce to use "any" alternative cost calculation methodology if it determines that a "particular market situation exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade." *Id.* § 1677b(e). It would be illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a particular market situation for constructed value, but still to rely on those same distorted costs for purposes of cost of production and the sales-below-cost test.

Our proposed interpretation would require the Court to depart from its previous determination in *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020), which, although is the first administrative review covering this antidumping duty order, is nonetheless persuasive authority, and not binding. *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

    2.    How do you respond to Plaintiffs' argument that reference to a "totality of the circumstances" analysis is not, without more, sufficient basis for the existence of a PMS where individual factors do not suffice? See Reply Br. of HiSteel Co., Ltd. and Kukje Steel Co., Ltd. at 12, Apr. 13, 2021, ECF No. 43 ("Pls.' Reply Br.").

The statute does not specify whether to consider particular market situation allegations individually or based on a totality of the circumstances. *See* 19 U.S.C. § 1677(15). Commerce

has intereperted this to may mean that even if one factor alone does not demonstrate that a particular market situation exists, when multiple factors are viewed together, they may demonstrate a particular market situation exists. *See* IDM at 19.

> a. What are the bounds of such a test? In other words, if each factor is itself insufficient, what additional analysis is Commerce required to undertake to demonstrate that the totality of the circumstances nevertheless reflect the existence of a PMS?

We do not necessarily agree with the proposition that every factor is insufficient alone. The totality of the circumstances is generally a fact-specific inquiry and a flexible one depending on the context. *See Inner Mong. Jianlong Biochemical Co., Ltd. v. United States*, 337 F. Supp. 3d 1329, 1347 (Ct. Int'l Trade 2018) (explaining for the *bona fide* sales analysis that "{t}he totality of the circumstances test is a flexible one, allowing {Commerce} to prioritize certain factors depending on the context, but it at least requires that Commerce consider as many factors as are relevant."); *Passenger Vehicle and Light Truck Tires From the Socialist Republic of Vietnam*, 86 Fed. Reg. 504 (Dep't of Commerce Jan. 6, 2021) (prelim. LTFV determ.), and accompanying PDM at 13 ("In making a decision to consider two or more entities a single entity for {anti-dumping} purposes, Commerce considers the totality of the circumstances and may place more reliance on some factors than others, depending on the fact-specific circumstances of the case."), *unchanged in Passenger Vehicle and Light Truck Tires From the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,559 (Dep't of Commerce May 27, 2021) (final LTFV determ.), and IDM at 37. As such, the bounds of the totality of the circumstances test is dependent on the facts. Even when each individual factor, when viewed in isolation is insufficient, Commerce may examine facts collectively to determine whether the total cumulative effect of the examined facts is sufficient.

3. How do you respond to Plaintiffs' argument that the cost of a specific input may nevertheless reflect the cost of production in the ordinary course of trade, and therefore not require adjustment, even where a PMS exists generally? Pls.' Reply Br. at 15–16.

Plaintiffs' argument belies the very point of Commerce finding that a particular market situation exists. Here, Commerce found that "there is sufficient evidence demonstrating that the market *as a whole* is distorted and a {particular market situation} exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the {cost of production} in the ordinary course of trade." IDM at 19 (emphasis added). Moreover, companies "do not operate in a vacuum, but, rather, purchase their inputs in a market. If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs." *Id.* In other words, once Commerce finds that a particular market situation exists, it necessarily follows that a specific input does not reflect the cost of production in the ordinary course of trade, because there are distortions in the whole market. *See id.*

    a. Please identify any record evidence connecting Commerce's determination that a PMS existed during the POR with the specific distortion of Plaintiffs' input costs.

As stated above, if a market is distorted as a whole, it is illogical to conclude that a company operating in that market is insulated from the market distortions with respect to cost. IDM at 19; *see, e.g., Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1340-41 (Ct. Int'l Trade 2019) (explaining that the soybean market as a whole was distorted without specifically examining the specific costs of the respondents).

Here, Commerce found that the market for hot-rolled coil was distorted and a particular market situation existed. The record evidence demonstrates that hot-rolled coil is the primary input into HWR production, that the mandatory respondents purchased hot-rolled coil during the

4

period of review from entities who had previously been found to receive subsidies from the Korean government for the production of hot-rolled coil, and that hot-rolled coil constitutes a substantial proportion of the cost of producing HWR pipe and tube during the period of review. *See* IDM at 15; *see also* PMS Allegation at 27 and Exhibits 7, 9, and 10; HiSteel's Feb. 27, 2019 Section B and C Questionnaire Response at Appendix D3-B; Kukje Steel's Aug. 7, 2019 Supplemental Section D Response at Exhibit S3-5; HiSteel's Feb. 27, 2019 Section B, C, and D Questionnaire Response at Appendix D-3-A; Kukje Steel's Aug. 7, 2019 Supplemental Section D Response at S3-3.

Commerce explained that the Korean steel market has been sharply impacted by imports of cheap Chinese steel products, placing downward pressure on Korean domestic steel prices. *See* IDM at 15. The GTIS, China Export Statistics for Hot-Rolled Products by Value, 2016-2018, was placed on the record and show that Korea is one of the top two destinations of Chinese exports of hot-rolled steel for the time period, which includes the period of review. IDM at 15; *see also* PMS Allegation Exhibit 113. Further, the GTIS, Summary- Korea Imports of Hot-Rolled Coil and Plate, 2013-2018, shows that Korean import prices of HRC from China have generally been significantly lower than they are from the rest of the world for the time period, which includes the period of review. *See* IDM at 16; *see also* PMS Allegation Exhibit 117. Moreover, the largest electricity supplier, KEPCO, is a government-controlled entity and experiencing operating losses that Commerce considered to be implausible without government control and cannot be considered competitively set. *See* IDM 16-17; *see also* PMS Allegation at Exhibits 97 and 98. Along with strategic alliances, which we explain further below, Commerce determined that a particular market situation existed.

5

4. Plaintiffs contend that Commerce lacked the expertise to reject Plaintiffs' expert report raising concerns about the regression analysis that Commerce used to calculate a PMS adjustment. Pls.' Reply Br. at 16–19. Please identify the record evidence underlying Commerce's rejection of the expert report.

Commerce employs economists with expertise in regression who reviewed the report provided by plaintiffs and found that the expert report was unpersuasive. Commerce addressed various concepts raised within the plaintiffs' expert report, such as the selection of independent variables and the assumption about capacity utilization rate. *See* IDM at 35-46. Commerce responded based upon evidence provided by technical experts in the field, including what has been published in *Wooldridge 5th edition* (2013). *See* IDM at 38 n.237; *see also* June 17 NFI Memo. In selecting among imperfect options, Commerce concluded that the regression analysis provided instead by petitioners "is a reasonable method to quantify the relationship between the global uneconomic capacity and the price of steel inputs." IDM at 35.

5. What cases and authorities best support your argument?

We refer the Court to the legislative history of the Trade Preferences Extension Act. *See* S. Rep. No. 114–45 (2015), 161 Cong. Rec. H4666-01, H4690 (daily ed. June 25, 2015) (statement of Rep. Meehan), and 161 Cong. Rec. S2899-05, S2900 (May 14, 2015). Cases that best support our argument include *Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1340-41 (Ct. Int'l Trade 2019) (finding that "Commerce points to considerable record evidence that a {particular market situation} exists in Argentina such that the cost of materials does not accurately reflect the cost of production in the ordinary course of trade" when "'reliable evidence demonstrates that Argentina's export tax regime impedes external trade and competitive pricing for soybeans,'" but ultimately remanding Commerce's particular market situation determination based upon a double remedies issue regarding the particular market situation adjustment), and *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1349 (Ct. Int'l Trade 2019) ("The

6

statute's language and legislative history permit Commerce's chosen methodology in this investigation, which was to consider allegations of a particular market situation based on the cumulative effect and the totality of the conditions in the foreign market. The court concludes that Commerce's particular market situation approach was reasonable in theory.").

In addition, the Federal Circuit has repeatedly "accorded particular deference to Commerce in antidumping determinations{,}" *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citing *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983) ("The Secretary has broad discretion in executing the {anti-dumping} law.")), and "'substantial deference to Commerce's statutory interpretation'" is given as Commerce is the "master" of antidumping laws. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995)).

6. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

It is possible pending cases at both the United States Court of Appeals for the Federal Circuit and in this Court may change the Court's analysis. The cases at the Federal Circuit include *NEXTEEL Co. v. United States*, CAFC No. 2021-1334, and *Hyundai Steel Company v. United States,* CAFC No. 2021-1748. A recent decision in this Court includes *Borusan Mannesmann v. United States*, Ct. No. 20-00015, Slip Op. 21-18, with pending cases that may involve the particular market situation issue in *NEXTEEL Co. v. United States*, Ct. No. 20-03868, *Hyundai Steel v. United States*, Ct. No. 18-00154, *Garg Tube Export LLP v. United States*, Ct. No. 20-00026, and *Garg Tube Export LLP v. United States*, Ct. No. 21-00169.

**III. Questions to Defendant the Government**

1. You argue that the court should permit Commerce to apply a PMS adjustment prior to a sales-below-cost test because this case is distinguishable from *Husteel*, *Borusan*, and *Dong-A Steel*; however, you only elaborate on the distinctions between this case and Saha Thai. Def.'s Br. at 21; *see Saha Thai Steel Pipe v. United States*, 43 CIT __, __, 422 F. Supp. 3d 1363 (2019), *Husteel v. United States*, 44 CIT __, __, 426 F. Supp. 3d 1376 (2020), *Borusan Mannesmann v. United States*, 44 CIT __, __, 426 F. Supp. 3d 1395 (2020), *Dong-A Steel*, 475 F. Supp. 3d 1317. Please clarify how this case is distinguishable from *Husteel*, *Borusan*, and *Dong-A Steel*.

The underlying legal question regarding statutory authority is exactly the same in *Husteel v. United States*, 426 F. Supp. 3d 1376 (2020), *Borusan Mannesmann v. United States*, 426 F. Supp. 3d 1395 (2020), and *Dong-A Steel v. United States*, 475 F. Supp. 3d 1317 (2020), in which Commerce made a particular market situation adjustment to the cost of production for the sales-below-cost test for home market sales. We apologize that our brief was unclear, as we meant to refer only to the recent slip opinion in *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, Slip Op. 20-181, No. 18-000214 (Ct. Int'l Trade Dec. 21, 2020), as distinguishable, whereas the other three cited cases are distinguishable only to the extent that they have not proceeded to final judgment and are based on different records

2. You contend that, based on four-factor totality of the circumstances test, a PMS exists in this case even where one did not exist in prior cases relying on the same four factors because this case includes more evidence on the record. Def.'s Br. at 17. Please identify the relevant additional evidence.

As we explained in our brief, Commerce determined that there is additional record evidence that a particular market situation exists that distinguishes this record from records in prior cases. For example, here, Commerce found that it was notable that KEPCO reported its first operating loss in six years for 2018 because it was implausible that losses of this magnitude, associated with KEPCO's pricing, would have occurred without government control, particularly when KEPCO explicitly states that its costs are submitted to the government of Korea to

8

establish the electricity rate. *See* IDM at 17; PMS Allegation at Exhibits 97 and 98. This evidence did not exist in previous records.

Moreover, updated data from GTIS, China Export Statistics for Hot-Rolled Products by Value, 2016-2018 and GTIS, Summary- Korea Imports of Hot-Rolled Coil and Plate, 2013-2018 show that Korea continues to be one of the top two destinations of Chinese exports of hot-rolled steel and that Korean import prices of HRC from China have been significantly lower than the rest of the world into this period of review. *See* IDM at 15; PMS Allegation Exhibit 113, 117.

    a.    You note that there is "ample evidence of the global overcapacity of steel and its impact on HRC prices in Korea, as well as the subsidization of electricity and HRC." *Id.* Is there similarly ample evidence to support the existence of the other two factors underlying the PMS determination?

For the other two factors, strategic alliances and subsidization of HRC, Commerce considered the evidence on the record and found that as part of the totality of the circumstances, strategic alliance and the subsidization of HRC contributed to finding that a particular market situation exists during the period of review. *See* IDM at 15-16. To the extent the Court equates "ample" with "substantial," substantial evidence exists to support this determination.

For example, the strategic alliances between Korean HRC suppliers and Korean HWR pipe and tube producers are demonstrated by the news articles on the record in this review in regard to fines levied by the Korean Fair Trade Commission in December, 2017, against Korean steel producers as well as a business proprietary declaration from 2013 and the verification of POSCO's cost responses in OCTG from Korea conducted in 2014. *See id.* at 16 n.80. Indeed, a Korean Fair Trade Commission official referred to the rigging of bids as a "long-term chronic practice." *Id.* at 16 n.83. Thus, Commerce found that strategic alliances contributed to the downward pressure of market prices. *See id.* at 16. The record evidence also demonstrates that the mandatory respondents purchased HRC during the period of review from entities who had

previously been found to receive subsidies from the Korean government for the production of HRC. *See id.* at 15.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | BRIAN M. BOYNTON<br>Acting Assistant Attorney General |
|  | JEANNE E. DAVIDSON<br>Director |
|  | s/Claudia Burke<br>CLAUDIA BURKE<br>Assistant Director |
| OF COUNSEL:<br>VANIA WANG<br>Attorney<br>Department of Commerce<br>Office of the Chief Counsel<br>  for Trade Enforcement & Compliance | s/Kara M. Westercamp<br>KARA M. WESTERCAMP<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 305-7571 |
| July 12, 2021 | Attorneys for Defendant |

## **CERTIFICATE OF COMPLIANCE**

      I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's order inviting responses to questions, in that it is less than 15 pages.

/s/Kara M. Westercamp