Slip Op. 21-126

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HISTEEL CO., LTD., and KUKJE STEEL CO., LTD.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | **Before: Gary S. Katzmann, Judge** |
| **and** | **Court No. 20-00146** |
| **NUCOR TUBULAR PRODUCTS INC., and ATLAS TUBE AND SEARING INDUSTRIES,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION</u>

[The court grants Plaintiffs' motion for judgment on the agency record and remands Commerce's <u>Final Results</u>.]

Dated: <u>September 23, 2021</u>

<u>Michael J. Chapman</u>, Winton & Chapman PLLP, of Washington, D.C., argued for Plaintiffs HiSteel Co., Ltd. and Kukje Steel Co., Ltd. With him on the briefs were <u>Jeffrey Winton</u>, <u>Amrietha Nellan</u>, and <u>Vi N. Mai</u>.

<u>Kara Marie Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Claudia Burke</u>, Assistant Director. Of counsel on the brief was <u>Vania Wang</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Robert DeFrancesco, III</u>, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor, Nucor Tubular Products, Inc. With him on the brief were <u>Enbar Toledano</u> and <u>Jake R. Frischknecht</u>.

<u>Elizabeth J. Drake</u>, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor,

Court No. 20-00146

Atlas Tube, a division of Zekelman Industries, and Searing Industries.  With her on the brief were Roger B. Schagrin, Christopher T. Cloutier, and Luke A. Meisner.

      Katzmann, Judge:  This case involves a challenge to the Department of Commerce's ("Commerce") determination that Korean producers of heavy walled rectangular welded carbon steel pipes and tubes ("HWR") sold HWR into the United States at prices below fair value.  The challenge raises three primary questions.  First, does the Trade Preferences Extension Act of 2015 ("TPEA") give Commerce statutory authority to make a contested adjustment to the cost of production in an antidumping ("AD") proceeding?  Second, may Commerce employ a "totality of the circumstances" approach to demonstrate that a particular market situation ("PMS") existed during the period of review ("POR")?  Finally, are Commerce's identification of a PMS in this case and resultant PMS adjustment to the cost of production supported by substantial evidence?

      In its final results of antidumping duty administrative review, published July 10, 2020, Commerce determined that Korean HWR producers were properly subject to AD duties and accordingly imposed duties of 53.80% for Dong-A Steel, 26.20% for HiSteel, 35.11% for Kukje Steel, and 29.07% for all non-selected respondents.  Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 85 Fed. Reg. 41,538, 41,539 (Dep't Commerce July 10, 2020), P.R. 402 ("Final Results").  On August 7, 2020, Plaintiffs HiSteel Co., Ltd. ("HiSteel") and Kukje Steel Co. Ltd., ("Kukje") (collectively, "Plaintiffs") initiated this suit against the United States ("Government" or "Defendant") to challenge the Final Results.  Summons, ECF No. 1.  Plaintiffs specifically contest Commerce's application of a PMS adjustment to the costs of hot-rolled steel coils ("HRC"), an input to HWR, before conducting a sales-below-cost test to determine the normal value of HWR.  Pls.' Mot. for J. on the Agency R. 2, Jan. 4, 2021, ECF No. 33 ("Pls.' Br.").  Plaintiffs argue that (1) Commerce does not have the authority to apply a PMS adjustment

Court No. 20-00146

to cost of production when conducting a sales-below-cost test; (2) a PMS does not exist in the Korean market for HRC; and (3) Commerce's PMS adjustment is not supported by substantial evidence. Pls.' Br. at 2–4. The court grants Plaintiffs' motion for judgment on the agency record and remands Commerce's determination that a PMS affected the price of hot-rolled steel coils during the POR and resultant application of an upward adjustment to the price of HRC prior to conducting a sales-below-cost test.

## BACKGROUND

### I.    *Legal Background*

Under the Tariff Act of 1930, Commerce is authorized to investigate potential dumping activity and, if dumping is found, levy AD duties on the unfairly priced goods. Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046 (Fed. Cir. 2012). Dumping occurs when a foreign company sells a product in the United States for less than its fair value. 19 U.S.C. § 1677b(a). Accordingly, to impose AD duties, Commerce must first determine whether a good is being sold at less than its fair value. Id.; 19 U.S.C. § 1673. In so determining, Commerce compares the product's export price or constructed export price (export price adjusted for various additional expenses pursuant to 19 U.S.C. § 1677a(c)–(d)) with the product's normal value. 19 U.S.C. § 1677b(a). Next, the International Trade Commission ("ITC") must determine whether the domestic industry that produces the product under investigation is materially injured, is threatened with material injury, or if the establishment of a domestic industry is materially retarded by the sale of the dumped product. Id. If dumping has occurred, and has been found to injure, threaten, or retard domestic industry, Commerce may impose AD duties on the dumped product. Id. The duty imposed should be equal to the "dumping margin," which is the calculated difference between the export price or constructed export price and the normal value of the merchandise. Id.

Court No. 20-00146

### A.    *Standard Normal Value Calculation Methodology*

Pursuant to 19 U.S.C. § 1677b, there are three possible ways to calculate normal value when the exporting country is a market economy.[1]  First, Commerce may average the product's prices in the home market ("the home market methodology").  19 U.S.C. § 1677b(a)(1)(B)(i).  If Commerce believes that some sales in the home market were made at prices below the cost of production, Commerce may conduct a sales-below-cost test, wherein Commerce determines that sales in the home market were made at prices below the cost of production and disregards those sales when calculating normal value.  19 U.S.C. § 1677b(b).  Second, where the product or an identical product is not offered for sale in the home market, Commerce can average the product's prices in a third country.  19 U.S.C. § 1677b(a)(1)(B)(ii).  Third, if the product or an identical product is not offered for sale in the home market, and notwithstanding the availability of third country sales data, Commerce may determine the product's normal value by calculating its constructed value. 19 U.S.C. § 1677b(a)(4).  Constructed value is calculated by summing the costs of production and processing of the product, and costs incurred by the exporter under investigation (or other representative exporters under investigation) in the course of the export and sale of the product.  19 U.S.C. § 1677b(e).

### B.    *Particular Market Situation Determinations and Adjustments under the TPEA.*

Broadly, a PMS exists when the market under investigation possesses a unique set of circumstances that "prevents a proper comparison" between a product's normal value and its export price or constructed export price.  <u>See</u> 19 U.S.C. § 1677b(a)(1)(B)(ii)(III).  While the Tariff

---

[1] Korea, the country at issue in this litigation, is undisputedly a market economy.  <u>See</u> 9 U.S.C. 1677(18); <u>Countries Currently Designated by Commerce as Non-Market Economy Countries</u>, Int'l. Trade Admin., <u>https://www.trade.gov/nme-countries-list</u> (last visited Sept. 22, 2021).

Court No. 20-00146

Act historically omitted explicit guidelines for the identification of a PMS, this changed with the passage of the Trade Preferences Extension Act of 2015 ("TPEA"), which amended the existing AD and countervailing duty statutes. See Tariff Act, Pub. L. 103-465, § 773 (1994) (amended 2015); Trade Preferences Extension Act of 2015 § 504, 19 U.S.C. §§ 1677(15), 1677b(e). Section 504 of the TPEA in particular provided greater color to the meaning and scope of particular market situations and clarified the circumstances under which Commerce may apply adjustments on the basis of a PMS determination. Section 504(a) further incorporated PMS determinations as a circumstance existing outside of a country's ordinary course of trade. See 19 U.S.C. § 1677(15)(C). Finally, section 504(c) of the TPEA amended the calculation of constructed value to allow for PMS-specific adjustments. See 19 U.S.C. § 1677b(e). Section 504(c) expressly stipulates that a PMS exists when "the costs of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," impeding Commerce's ability to accurately estimate a product's constructed value. See 19 U.S.C. § 1677b(e)(3). Once Commerce determines that a PMS exists, the TPEA authorizes Commerce to use "any other calculation methodology" to determine the cost of production in the exporting country for the purposes of calculating constructed value. Id.

## II.    Factual Background

### A.    Commerce's Administrative Review of HWR

On November 15, 2018, the Department of Commerce initiated a review on an AD order on HWR from Korea. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 57,411 (Dep't Commerce Nov. 15, 2018), P.R. 5. Commerce selected HiSteel and Dong-A Steel Co., Ltd. (later replaced by Kukje) for individual examination as

Court No. 20-00146

mandatory respondents.[2]  Second Respondent Selection Memo (Dep't Commerce Dec. 18, 2018), P.R. 17.

On April 2, 2019, Nucor Tubular Products, Inc. ("Nucor") -- then operating as Independence Tube Corporation and Southland Tube, Incorporated (together, "Petitioners") -- submitted to Commerce a cost-based PMS allegation for the price of HRC as an input for HWR. Pet'rs' April 2, 2019, PMS Allegation (Apr. 2, 2019), P.R. 51–236, C.R. 36–122.  Petitioners' PMS allegation was based on four factors, including (1) the distortive effect of unfairly traded steel from China; (2) the subsidization of Korean hot-rolled steel production by the Korean government; (3) distortive government control over electricity prices in Korea; and (4) strategic alliances between Korean HRC suppliers and Korean HWR producers.  Id. at 27–30.  Additionally, Petitioners proposed a regression model to capture the distortive effect of the steel overcapacity on the Korean market, which Petitioners alleged amounted to a PMS in this instance.  Id. at 43–60.  Plaintiffs each subsequently submitted a PMS rebuttal, including additional facts and comments in response to Nucor's PMS allegation.  See HiSteel's May 10, 2019 PMS Rebuttal

---

[2] In AD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
> >
> > (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

Court No. 20-00146

(May 10, 2019), P.R. 257–259, C.R. 136–141, Kukje Steel's May 10, 2019 PMS Rebuttal (May 10, 2019), P.R. 262–274, C.R. 142–155.

### B.    *Preliminary Results*

On November 18, 2019, Commerce published its <u>Preliminary Results</u> stating that a cost-based PMS existed with respect to Korean HRC which distorted the market for HWR.  <u>Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Prelim. Results of Antidumping Duty Administrative Review; 2017–2018</u>, Fed. Reg. 63,613 (Dep't Commerce Nov. 18, 2019), P.R. 348 ("<u>Preliminary Results</u>"); <u>see also</u> Decision Mem. for the Prelim. Results of the 2017–2018 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, (Dep't Commerce Nov. 6, 2019), P.R. 342 ("PDM").  This determination was based on the same four factors proposed by Petitioners: (1) the distortive effect of imported Chinese steel; (2) domestic subsidization of Korean hot-rolled steel; (3) distortive government control over electricity prices in Korea; and (4) strategic alliances between Korean HRC and HWR producers.  PDM at 9, 14–15.  In addition, Commerce found that it had the authority, upon determining that a PMS existed, to adjust the cost of production ("COP") for a sales-below-cost test.  <u>Id.</u> at 14–15, 20–24.  Finally, Commerce accepted Petitioners' proposed regression model to quantify the effect of the PMS.  <u>Id.</u> at 16.

### C.    *Final Results*

In response to the <u>Preliminary Results</u>, Korea's Ministry of Trade, Industry and Energy submitted a letter to Commerce detailing Korea's objections to the regression-based PMS adjustment applied in this case.  <u>See</u> MOTIE Letter (Nov 26, 2019), P.R. 350.  Additionally, Petitioners and Plaintiff Kukje each submitted case briefs responding to Commerce's <u>Preliminary</u>

Court No. 20-00146

Results. Petitioners, HiSteel, and Kukje each submitted rebuttal briefs.  See HiSteel Rebuttal Br.

(Feb. 3, 2020), P.R. 370-371, C.R 205–206; Kukje Rebuttal Br. (Feb. 3, 2020), P.R. 369, C.R. 204;

Pet'rs' Rebuttal Br. (Feb. 4, 2020), P.R. 373, C.R. 207.

After reviewing materials from the interested parties, Commerce issued its Final Results.

Final Results at 41,538.  In the issues and decision memorandum accompanying the Final Results,

Commerce affirmed that a PMS existed with respect to Korean HRC which affected the market

for HWR, that Commerce had the authority to apply a PMS adjustment before conducting a sales-

below-cost test, and that Petitioners' regression model, with a few modifications, was acceptable

to quantify the PMS adjustment.  Issues and Decision Mem. For the Final Results of the 2017–

2018 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular

Welded Carbon Steel Pipes and Tubes from the Republic of Korea (Dep't Commerce July 7, 2020),

P.R. 395 ("IDM").  Commerce then employed the PMS-adjusted COP to calculate AD duty rates

of 53.80% for Dong-A Steel, 26.20% for HiSteel, 35.11% for Kukje, and 29.07% for all non-

selected respondents.  Final Results at 41,539.

### III.    Procedural History

HiSteel and Kukje initiated this litigation on August 7, 2020 to challenge Commerce's

Final Results.  Summons.  The court granted motions to intervene for both Nucor and Atlas Tube

and Searing Industries ("Atlas") on September 25, 2020 and September 28, 2020, respectively.

ECF No. 27, ECF No. 28. On January 4, 2021, Plaintiffs filed a Rule 56.2 Motion for Judgment

on the Agency Record.  Pls.' Br.  Defendant the United States and Defendant-Intervenors Nucor

and Atlas ("Defendant-Intervenors") each filed a response to Plaintiffs' motion.  Def.-Inter.'s

Mem. in Resp. to Pls.' Mot. for J. on the Agency R., Mar. 16, 2021, ECF No. 40 ("Def.-Inter.'s

Br. (Atlas)"); Def.'s Resp. to Pls.' Mot. for J. on Agency R., Mar. 16, 2021, ECF No. 41 ("Def.'s

Court No. 20-00146

Br."); Def.-Inter.'s Resp. to Pls.' Mot. for J. on the Agency R., Mar. 16, 2021, ECF No. 42 ("Def.-Inter.'s Br. (Nucor)"). Plaintiffs subsequently submitted a reply brief. Reply Br. of HiSteel Co., Ltd. and Kukje Steel Co., Ltd., Apr. 13, 2021, ECF No. 43 ("Pls.' Reply Br.").

Preceding oral argument, the court presented questions to which the parties replied in writing. See Ct.'s Letter Regarding Questions for Oral Arg., July 1, 2021, ECF No. 49; Pls.' Resp. to the Ct.'s Questions for Oral Arg., July 12, 2021, ECF No. 51 ("Pls.' Resp. to the Ct.'s Questions"); Def.-Inter. Nucor's Resp. to Ct.'s Questions for Oral Arg., July 12, 2021, ECF No. 52; Def.'s Resp. to the Ct.'s Questions for Oral Arg., July 12, 2021, ECF No. 53 ("Def.'s Resp. to the Ct.'s Questions"); Def.-Inter. Atlas's Resp. to Ct.'s Questions for Oral Arg., July 12, 2021, ECF No. 54. The court filed additional questions for the parties to address at oral argument. See Ct.'s Letter Regarding Questions for Oral Arg., July 13, 2021, ECF No. 55. Oral argument was held on July 14, 2021 via videoconference. ECF No. 56. The parties filed additional post-argument submissions to address issues presented at argument. Def.-Inter.'s Suppl. Br. (Atlas), July 21, 2021, ECF No. 57; Pls.' Suppl. Br., July 21, 2021, ECF No. 58; Def.-Inter.'s Suppl. Br. (Nucor), July 21, 2021, ECF No. 59; Def.'s Suppl. Br., July 21, 2021, ECF No. 60.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and 19 U.S.C. § 1516a(a)(2)(B)(i). The standard of review in AD duty proceedings is governed by 19 U.S.C. § 1516a(b)(1)(B)(i), which provides that "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." Agency determinations must be supported by substantial evidence. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed. Cir. 1984).

Court No. 20-00146

## DISCUSSION

Plaintiffs argue that Commerce's <u>Final Results</u> should not be sustained because: (1) Commerce does not have the authority to adjust for a PMS prior to a sales-below-cost test under 19 U.S.C. §1677b(b); (2) Commerce fails to present substantial evidence that a PMS existed in the Korean market for HRC during the POR; (3) Commerce's PMS adjustment is not supported by substantial evidence. The court agrees with Plaintiffs that Commerce does not have the authority to apply a PMS adjustment prior to a sales-below-cost test. The court further concludes that, even if Commerce had the authority to adjust apply a PMS adjustment prior to the sales-below-cost test, it fails to present substantial evidence that a PMS existed in this instance, or to support its PMS adjustment. The court accordingly remands Commerce's determination that a PMS affected the price of HRC during the POR, and resultant application of an upward adjustment to the price of HRC prior to conducting a sales-below-cost test, for further proceedings consistent with this opinion.

### I.    *Commerce Cannot Adjust for a PMS before Conducting a Sales-Below-Cost Test*

In arguing that Commerce impermissibly applied a PMS adjustment prior to conducting a sales-below-cost test, Plaintiffs rely on both the plain language of the statute and on prior decisions of the court. Pls.' Br. at 4–7. Defendants oppose Plaintiffs' argument by contending that the plain language of the statute in fact gives Commerce the authority to apply a PMS adjustment prior to a sales-below-cost test. Def.'s Br. at 19–22. Additionally, Defendants contend that even if the statute does not directly speak on the issue, Commerce's interpretation of the statute was reasonable and should therefore be upheld. <u>Id.</u>

The court concludes that Commerce cannot adjust for a PMS before conducting a sales-below-cost test under 19 U.S.C. § 1677b(b). In determining whether Commerce exceeded its

Court No. 20-00146

authority in this instance, the court finds that under a <u>Chevron</u> analysis, section 504 of the TPEA

"directly spoke" on Commerce's authority to apply a PMS before a sale-below-cost test when

calculating normal value, and if even if it did not, Commerce's interpretation of the statute was

not reasonable. <u>Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 467 U.S. 837, 842 (1984).

### A.    *The Plain Language of the Statute Indicates that Commerce Cannot Apply a PMS Adjustment Prior to Conducting a Sales-Below-Cost Test*

As has been noted, Plaintiffs assert that Commerce does not have the authority to adjust

COP in a sales-below-cost test to account for a particular market situation ("PMS"). Pls.' Br. at

4. Plaintiffs argue that Section 504(a) of the Trade Preferences Extension Act ("TPEA") permits

Commerce to account for a PMS when using the constructed value method to calculate normal

value under 19 U.S.C. § 1677b(c), but does not permit Commerce to account for a PMS when

conducting a sales-below-cost test in its calculation of normal value from home market value under

19 U.S.C. § 1677b(b), as Commerce did here. Pls.' Br. at 4–5. The Government and Defendant-

Intervenor Atlas argue that once Commerce has determined that a PMS exists, Commerce has

broad authority to adjust input costs that are outside the ordinary course of trade. Def.'s Br. at 19–

20; Def.-Inter.'s Br. (Atlas) at 5–7. Finally, Defendant-Intervenor Nucor contends that Plaintiffs'

argument that Congress directly spoke on the issue by excluding PMS adjustments from the

statutory language on the sales-below-cost test cannot survive a <u>Chevron</u> analysis because, in an

administrative setting, a congressional mandate in one section and silence in another suggests that

Congress decided to leave the question to agency discretion rather than speaking directly to a

prohibition. Def.-Inter.'s Br. (Nucor) at 19–21.

The court concludes that Commerce does not have the authority, based on the plain

language of the statute, to apply a PMS adjustment in this instance. Despite Defendant and

Defendant-Intervenor's attempts to argue that once a PMS is identified, Commerce can use "any

Court No. 20-00146

other calculation methodology" to calculate cost of production,[3] the statutory provision allowing for other calculation methodologies is modified by the language "for the purposes of paragraph (1)," where paragraph one pertains to the cost of materials in the calculation of constructed value under section 1677b(c).[4] No similar language appears under the provisions for calculating normal value using the home market methodology set forth in section 1677b(a)(1). See 19 U.S.C. § 1677b(a)(1). Additionally, as Plaintiffs note, 19 U.S.C. § 1677b(f) explicitly lists "special rules" for calculating COP for a sales-below-cost test but does not mention PMS adjustments. 19 U.S.C. § 1677b(f); Pls.' Br. at 6–7. This language therefore does not apply when Commerce is using the home market methodology for calculating normal value under section 1677b(a)(1).

The court is not persuaded by Defendant-Intervenor Atlas's argument that Commerce's authority to use "any other calculation methodology" should not be limited to the calculation of constructed value simply because it appears in that statutory section. Indeed, Atlas's argument that the Federal Circuit has previously declined to limit plain language based on the section where that language appears relies on a case, Genetech Inc. v. Eli Lilly & Co., 998 F.3d 931, 941–42 (Fed. Cir. 1993) (abrogated on other grounds by Wilton v. Seven Falls Co., 515 U.S. 277 (1995)),

---

[3] "For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology." 19 U.S.C. § 1677b(e).

[4] At oral argument, Plaintiffs asserted that the phrase "such that" in 19 U.S.C. § 1677b(e)(3) demonstrates that any PMS that Commerce finds must affect the COP so as to render the COP outside the ordinary course of trade. Oral Argument at 16:20. If the COP is outside the ordinary course of trade, then Commerce can adjust for a PMS when calculating constructed value. 19 U.S.C. 1677b(e). In their supplemental brief, Defendant-Intervenor Nucor objected to Plaintiffs' interpretation of this language and instead argued that "such that" indicated the subsequent language is illustrative rather than conditional. Def.-Inter.'s Suppl. Br. (Nucor) at 2–3. The court agrees with the Plaintiffs; if a PMS exists but has no impact on the COP, or the COP is not outside the ordinary course of trade, then the PMS is irrelevant to the calculation of normal value for purposes of a sales-below-cost test.

Court No. 20-00146

which is inapposite here.  Def.-Inter.'s Br. (Atlas) at 6–7.  In <u>Genetech</u>, the court declined to limit the application of statutory language based on the heading under which it appeared where there was no further indication that narrow application was intended.  <u>See</u> Def.-Inter.'s Br. (Atlas) at 7 (quoting <u>Genentech</u>, 998 F.3d at 941–42).  In this instance, the statutory text itself limits the text's cross-applicability since the relevant provision explicitly limits its application to the calculation of constructed value.  <u>See</u> 19 U.S.C.  § 1677b(e)(3) ("<u>For purposes of paragraph (1)</u> . . . the administering authority may use another calculation methodology") (emphasis added).

Nor is the court persuaded by Defendant-Intervenor Nucor's contention that Plaintiffs' arguments fail to satisfy <u>Chevron</u>.  Def.-Inter.'s Br. (Nucor) at 18–21.  Nucor alleges that, as Congress has not spoken directly on the issue, <u>Chevron</u> requires that the court conclude that Congress intended to leave the interpretation of the statute to agency discretion.  <u>Id.</u>; <u>see also</u> <u>Van Hollen, Jr. v. Fed. Election Comm'n</u>, 811 F.3d 486, 493 (D.C. Cir. 2016) ("The <u>expressio unius</u> canon[5] operates differently in our review of agency action than it does when we are directly interpreting a statute."); <u>and see</u> <u>Cheney R.R. Co. v. Interstate Com. Comm'n</u>, 902 F.2d 66, 69 (D.C. Cir 1990) ("Here the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision <u>not to mandate</u> any solution in the second context, i.e., to leave the question to agency discretion. Such a contrast (standing alone) can rarely if ever be the 'direct [ ]' congressional answer required by <u>Chevron</u>.'" (citing <u>Chevron</u>, 467 U.S. at 842–43)) (emphasis in original).  However, the cases that Nucor cites to reject the expressio unius canon in this instance are at odds with this court's prior interpretation of the statute.  In

---

[5] "The statutory interpretive canon of expressio unius est exclusio alterius, provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'" <u>Schlafly v. Saint Louis Brewery, LLC</u>, 909 F.3d 420, 425 (Fed. Cir. 2018) (quoting <u>N.L.R.B. v. SW Gen., Inc.</u>, 137 S.Ct. 929, 933 (2017)).

Court No. 20-00146

Dong-A Steel v. United States, for example, the court found that the plain language of the statute was sufficient to demonstrate that Commerce did not have the authority to apply a PMS adjustment before a sales-below-cost test.  Dong-A Steel v. United States, 44 CIT __, 475 F. Supp. 3d 1317, 1338–41 (2020).  The court relied on Federal Circuit precedent stating that "where 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Id. at 1339 (quoting Thomas v. Nicholson, 423 F.3d 1279, 1284 (Fed. Cir. 2005)).  Here, the court again adopts the analysis set out in Dong-A Steel and finds that the plain language of the statute demonstrates that Commerce lacks the authority to apply a PMS in this instance.

### B.   Commerce's Interpretation of the Statute Was Not Reasonable

For the reasons stated above, the statute does, in fact, speak directly to Commerce's ability to apply a PMS adjustment prior to a sales-below-cost test.  In the interest of judicial economy, the court nevertheless proceeds to address the arguments by Defendant-Intervenors Atlas and Nucor that, in the case that the statute were ambiguous, Commerce reasonably interpreted the statute to permit its application of PMS adjustments. [6]  Under Chevron, if a statute does not "directly speak" to the issue at hand, the court must determine whether the agency's interpretation of the statute was "reasonable," meaning that the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute."  467 U.S. at 844.  So long as the agency's interpretation is reasonable, it must be upheld.  Id.  Here, the court rejects Defendant-Intervenors' arguments because Commerce's interpretation does not meet the standard set forth by Chevron.  Accordingly,

---

[6] Plaintiffs do not address whether, if the statute does not directly address the issue, Commerce's interpretation of the statute was reasonable under Chevron.

Court No. 20-00146

even if the statute did not directly address the question of Commerce's ability to apply a PMS adjustment prior to a sales-below-cost test, Commerce's interpretation of the statute was unreasonable and cannot be upheld.

Defendant-Intervenor Atlas first notes that the section addressing calculation of constructed value, 19 U.S.C. § 1677b(e), uses similar language to describe COP as the section outlining the sales-below-cost test as applied to home market value, 19 U.S.C. § 1677b(b)(3)(A), which does not mention PMS adjustments. Def.-Inter.'s Br. (Atlas) at 7–11. On the basis of the similar language, Atlas argues that the TPEA effectively added PMS adjustments to both provisions. Id. at 8. However, in Husteel the court specifically interpreted the difference between those two provisions to demonstrate that the statute intends for Commerce to permit a PMS adjustment for one methodology and not the other, as opposed interpreting the similarities in the provisions as effectively adding PMS adjustments to both methodologies, as Atlas contends. Husteel v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1383 (2020). The court is persuaded by the analysis in Husteel and therefore rejects the argument now posed before us.

Second, both Atlas and Nucor allege that given that the term "ordinary course of trade" is used throughout the statute and refers to a scenario where costs and prices form the basis of a fair comparison, Commerce reasonably inferred they could adjust costs for a PMS to achieve a normal value "in the ordinary course of trade." Def.-Inter.'s Br. (Atlas) at 8–10; Def.-Inter.'s Br. (Nucor) at 24. Once again, this is an argument that the court has previously rejected. See Husteel, 426 F. Supp. 3d at 1388 ("Commerce apparently assumes . . . that when Congress amended the statute to define 'ordinary course of trade' in 2015, it enabled Commerce to make PMS adjustments to the COP for purposes of the below cost sales test . . . . However, Commerce is not authorized to tinker with the below cost sales calculation because of a PMS."). As neither Atlas nor Nucor has

Court No. 20-00146

provided sufficient grounds for departing from the analysis in <u>Husteel</u>, the court again adopts its analysis here.

Third, Atlas argues that it would be inconsistent of the statute to permit PMS adjustments when calculating normal value via constructed value but not when relying on home market value. Def.-Inter.'s Br. (Atlas) at 10. However, "[t]he plain meaning of the statutory scheme is not illogical." <u>Husteel,</u> 426 F. Supp. 3d at 1388. Rather, the court finds that the statute permits Commerce to adjust for a PMS when determining home market value by allowing for the exclusion of sales below COP under 19 U.S.C. § 1677b(b). In the alternative, Commerce may determine normal value through the calculation of constructed value, or by relying on prices from a third country. 19 U.S.C. § 1677b(a)(1)(B)(ii), (a)(4). The court in <u>Husteel</u> persuasively explained that permitting a PMS adjustment to COP is illogical because "a PMS that affects costs of production would presumably affect prices for domestic sales and export sales so there would be no reason to adjust only the home market prices," whereas "[i]f the PMS was of a kind that only affected domestic sales, then it would be one which prevented 'a proper comparison with the export price or constructed export price' and Commerce would move to either third country sales or constructed value." 426 F. Supp. 3d at 1388–89 (quoting 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii)). Therefore, despite Defendants' repeated attempts to assert otherwise, the court again concludes that the statute's exclusion of PMS adjustments made prior to the sales-below-cost test does not create any inconsistency between the home market and constructed value methodologies.

Fourth, Atlas argues that, as the statute is intended to result in a fair comparison between export price and normal value, Commerce must be allowed to adjust for any identified PMS before conducting a sales-below-cost test. Def.-Inter.'s Br. (Atlas) at 11. Again, as discussed above, this argument is incorrect because if a PMS affects COP, then COP would be similarly distorted for

Court No. 20-00146

both the export price and normal value, and therefore not prevent a fair comparison.  Husteel, 426

F. Supp. 3d at 1388.  If the PMS only affects domestic prices, Commerce is permitted to rely on

third country prices, or to resort to the constructed value methodology, which explicitly permits a

PMS adjustment.  Id. at 1389.  Therefore, the court rejects Atlas's argument that Commerce must

be allowed to adjust for a PMS prior to conducting a sales-below-cost test to achieve a fair

comparison.

Finally, Defendant-Intervenor Nucor offers an argument in support of Commerce's

interpretation based on the TPEA's legislative history.  Def.-Inter.'s Br. (Nucor) at 24–25.  Nucor

cites a Senate Finance Committee report to show that Congress intended PMS adjustments to

correct for distortions in prices or costs and further intended to give Commerce "flexibility" to

calculate a duty that was not based on such distortions.[7]  Id. at 25.  However, nothing in the cited

language evinces Congressional intent to allow Commerce to correct for PMS distortions to the

home market value specifically.  As discussed above, the TPEA does allow for flexibility to adjust

for a PMS by providing alternative methodologies to calculate normal value.  The court has already

rejected an interpretation of the statute that imputes a PMS adjustment to the calculation of home

market value simply because such adjustment is available in the calculation of constructed value.

---

[7] Nucor cites to a Senate Finance Committee report quoting Representative Patrick Meehan during the House floor debates on the TPEA to demonstrate that the TPEA was meant to empower Commerce to account for distorted prices or costs.  Def.-Inter.'s Br. (Nucor) at 24–25.  Based on this language, Nucor argues that the TPEA's sections on PMS adjustments includes costs of production for a sales-below-cost test.  Id. at 25.  Plaintiffs note that Representative Meehan was referring to sections of the TPEA other than the section on PMS adjustments.  See Pls.' Suppl. Br. at 4–5. Additionally, Plaintiffs argue that "[t]o overcome the plain meaning of a statute, a party must show that the legislative history demonstrates an extraordinary showing of contrary intentions."  Id. at 5 (quoting Res-Care v. United States, 735 F. 3d 1384, 1389 (Fed. Cir. 2013)).  The court agrees with Plaintiffs that the plain meaning of the statute is sufficiently clear that a PMS adjustment is not permitted prior to conducting a sales-below-cost test.  Nucor's cited language does not refer to the section at issue and is not otherwise persuasive that the intentions of Congress are inadequately conveyed by the plain language of the statute.

Court No. 20-00146

Nucor's argument from legislative history provides no additional evidence that the plain language of the statute fails to adequately account for potential distortions such that the allowance made for PMS adjustments to constructed value should be imputed to home market value. 19 U.S.C. § 1677b(a)–(b), (e). The court thus rejects Nucor's argument, and concludes that the legislative history presented provides no basis for departure from its prior decisions. Accordingly, the court concludes that Commerce's interpretation of the statute was unreasonable and cannot be upheld.

### C.    *Prior CIT Cases Support a Finding That Commerce Does Not Have Authority to Apply a PMS in This Instance*

The court notes that prior CIT cases support Plaintiffs' assertion that Commerce lacks authority to apply a PMS adjustment in this instance. Plaintiffs cite four prior cases, Saha Thai, Husteel, Borusan, and Dong-A Steel, to demonstrate that this court has consistently rejected Commerce's application of a PMS adjustment in a sales-below-cost test. Pls.' Br. at 5–6. In Saha Thai, the court held that "[t]he TPEA did not provide a basis for calculating the cost of production in the sales-below-cost test." Saha Thai Steel Pipe v. United States, 43 CIT __, __, 422 F. Supp. 3d 1363, 1371 (2019). The court reasoned that since Congress amended the sales-below-cost provision for a different purpose, Congress was aware of the sales-below-cost test when it enacted the TPEA and nevertheless declined to amend the provision to incorporate potential PMS adjustments. Id. In Husteel, the court held that Commerce's application of a PMS adjustment prior to a sales-below-cost test was contrary to law based on the plain language of the statute. Husteel, 426 F. Supp. 3d at 1383 ("The plain language of the statute prohibits Commerce's action and therefore its PMS adjustment is contrary to law."). Both Borusan and Dong-A Steel followed similar reasoning in rejecting Commerce's application of a PMS adjustment when conducting a sales-below-cost test. See Borusan Mannesmann v. United States, 44 CIT __, __, 426 F. Supp. 3d 1395, 1411 (2020) ("… in recent and thorough opinions the court has explained that no adjustment

Court No. 20-00146

for a PMS is permitted for the sales-below-cost test."), Dong-A Steel, 475 F. Supp. 3d at 1341

("… Commerce would not be allowed to adjust the sales-below-cost calculation on account of a

PMS determination.").

Although the Government acknowledges that the court rejected Commerce's approach in

at least Saha Thai, it argues that the court's determination in that case is not final, and that the

Government has not yet decided whether to appeal that conclusion.  Def.'s Br. at 21–22.  The

Government only attempts to distinguish this case from Saha Thai.  The Government asserts that

this case is distinguishable from other relevant CIT cases only insofar as other cases have not

proceeded to final judgment and are based on a different record.  See Def.'s Resp. to the Ct.'s

Questions at 8 (citing Husteel, 426 F. Supp. 3d 1376, Borusan, 426 F. Supp. 3d 1395, and Dong-

A Steel, 475 F. Supp. 3d 1317).  Overall, the Government's attempt to distinguish this case from

prior cases is unpersuasive.  The court thus adopts the conclusions of its previous decisions and

finds that Commerce does not have authority to apply a PMS before a sales-below-cost test.

## II.    *Commerce Did Not Present Substantial Evidence That a PMS Existed During the POR*

Even if Commerce's pre-test application of a PMS adjustment were permitted by law,

Commerce nevertheless failed to provide substantial evidence that a PMS existed during the POR.

Commerce's allegation that a PMS existed during the review period and distorted the market for

HRC in Korea is based on a "totality of the circumstances" test that determined the presence of a

PMS based on the cumulative effect of four different factors.  See Def.'s Br. at 15–19.  Plaintiffs

argue that the court has previously rejected Commerce's attempts to use a totality of the

circumstances test to prove the existence of a PMS.  Pls.' Br. at 21.  The Government, on the other

hand, argues that Commerce has successfully established the existence of a PMS in the Korean

Court No. 20-00146

market for HRC using a totality of the circumstances test in this instance.  Def.'s Br. at 16–17.

The court concludes that, while Commerce may be

 able to use a totality of the circumstances approach to prove the existence of a PMS even

where no single factor would alone suffice, in this instance Commerce fails to present adequate

evidence that a PMS existed and distorted the HRC market during the POR.

### A.    *Commerce Could Find That the Four Factors Alleged in This Case Cumulatively Created a PMS Even if No One Factor Individually Created a PMS*

Relying on the court's reasoning in <u>Nexteel</u>, Plaintiffs argue that if no factor individually

amounts to a PMS, then the cumulative effect of the factors cannot constitute a PMS.  Pls.' Br. at

21; <u>see</u> <u>Nexteel Co. v. United States</u>, 43 CIT __, __, 355 F. Supp. 3d 1336, 1349–51 (2019)

("<u>Nexteel I</u>").  The Government responds by acknowledging that the court has previously rejected

Commerce's finding of a PMS based on the totality of the circumstances when no one contributing

factor satisfied the standard independently, but arguing that this case is distinguishable based on

the court's rulings in <u>Nexteel I</u>, <u>Hyundai</u>, and <u>Dong-A Steel</u>.  Def.'s Br. at 15; <u>see</u> <u>Nexteel I</u>, 355

F. Supp. 3d at 1349, <u>Dong-A Steel</u>, 475 F. Supp. 3d at 1333–1335, <u>Hyundai Steel Co. v. United</u>

<u>States</u>, 43 CIT __, __, 415 F. Supp. 3d 1293, 1300 (2019).  The Government argues first that in

prior cases the court did not reject the totality of the circumstances test itself but rather Commerce's

application of the test in those instances, in part because of a lack of supporting evidence.  Def.'s

Br. at 16–17.  The Government and Atlas further argue that this case is distinguishable from prior

cases because there is more evidence on the record to support Commerce's identification of a PMS.

Def.'s Br. at 17; Def.-Inter.'s Br. (Atlas) at 19–20.

The court determines that the Government is correct that prior CIT cases did not reject

Commerce's totality of the circumstances approach to PMS determinations.  Although Plaintiffs

assert that prior CIT cases rejected PMS determinations based on the four factors alleged here, their characterization of prior court cases is misleading. The five cases cited by Plaintiffs specifically conclude that Commerce presented insufficient evidence to support a PMS determination based on those four factors. See Nexteel I, 355 F. Supp. 3d at 1346, Nexteel Co. v. United States, 44 CIT __, __, 392 F. Supp. 3d at 1276, 1287–88 (2019) ("Nexteel II"); Dong-A Steel, 475 F. Supp. 3d at 1333–1335; Hyundai Steel Co., 415 F. Supp. 3d at 1300; Husteel, 426 F. Supp. 3d at 1391–92. Each determination was rejected in light of the specific circumstances at issue, rather than Commerce's cumulative approach generally or even the factors considered. See Nexteel I, 355 F. Supp. 3d at 1346, 1349; Nexteel II, 392 F. Supp. 3d at 1287–88; Dong-A Steel, 475 F. Supp. 3d at 1333–1335, Hyundai Steel Co., 415 F. Supp. 3d at 1300; Husteel, 426 F. Supp. 3d at 1391–92. Indeed, Husteel and Nexteel I specifically acknowledge the possibility that a PMS determination could be based on the cumulative effect of multiple distortive factors. See Husteel, 426 F. Supp. 3d at 1392 ("Although Commerce may rely on the cumulative effect of multiple distortions to arrive at a PMS determination, it cannot use that phrase to circumvent a meaningful review of the sufficiency of the record."); Nexteel I, 355 F. Supp. 3d at 1349 (concluding that "Commerce's particular market situation approach was reasonable in theory"). The court therefore concludes that Commerce has not been prohibited from reaching a PMS determination based on the four factors presented here using a totality of the circumstances test.

Nor is the court persuaded by Defendant-Intervenor Nucor's argument that the Nexteel line of cases, which previously rejected Commerce's totality of the circumstances test for identifying a PMS, were wrongly decided. Def.-Inter.'s Br. (Nucor) at 26–28; see Nexteel I, 355 F. Supp. 3d at 1351. Nucor first argues that Nexteel I and its progeny relied on the incorrect premise that Commerce cannot change its mind between preliminary and final determinations, whereas in fact

Court No. 20-00146

preliminary determinations are nonbinding.  Def.-Inter.'s Br. (Nucor) at 28–29 (citing 355 F. Supp. 3d at 1351).  Nucor next alleges that the Nexteel I court "illogically" rejected Commerce's determination on the basis that Commerce initially determined that the factors contributing to the alleged PMS could not substantiate such a finding individually, but nevertheless ultimately found the existence of a PMS under the totality of the circumstances.  Def.-Inter.'s Br (Nucor) at 30. Nucor argues that a totality of the circumstances "is, by definition, greater than the sum of its parts" and can therefore clearly be satisfied by the "totality" of factors even when no one factor could support the finding of a PMS individually.  Def.-Inter.'s Br. (Nucor) at 30–31.  Therefore, Nucor argues, Nexteel was wrongly decided and Commerce's determination was reasonable based on the totality of the circumstances.  Id. at 31–33.

The court finds that Nucor mischaracterizes the court's position in Nexteel I.  Prior cases did not reject Commerce's PMS determination because Commerce changed its mind between its preliminary and final determinations, but because Commerce changed its mind without offering any additional evidence. 355 F. Supp. 3d at 1351.  In the final determination at issue in Nexteel I, Commerce made no changes to its preliminary analysis beyond moving from the consideration of individual factors to the consideration of the factors combined, but nevertheless reached the opposite conclusion.  Id. at 1346.  The court determined that Commerce's reversal of its preliminary determination was unreasonable not because Commerce reached a different conclusion, but because the conclusion changed despite there being no changes to the evidence under consideration.  Id. at 1351. "It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion."  Id.  Although, as Nucor contends, a totality of the circumstances test could be satisfied by the "totality" of factors even when no one factor would satisfy the test alone,

Court No. 20-00146

this does not mean "that under a totality of the circumstances test, a collection of unsubstantiated allegations can be combined into a substantiated one." Hyundai Steel Co., 415 F. Supp. 3d at 1301. Accordingly, Nucor's argument that the Nexteel line of cases incorrectly rejects the totality of the circumstances test lacks merit.

### B.    The Government Failed to Present Substantial Evidence of a PMS in the Korean Market for HRC During the POR

Substantial evidence "has been defined as 'more than a mere scintilla,' [and] as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The substantiality of evidence must account for anything in the record that reasonably detracts from its weight. CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)). Commerce must also examine the record and provide an adequate explanation for its findings such that the record demonstrates a "rational connection between the facts found and the [determination] made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); see Jindal Poly Films Ltd. of India v. United States, 43 CIT __, __, 365 F. Supp. 3d 1379, 1383 (2019). Commerce's findings may be found to be supported by substantial evidence even where two inconsistent conclusions could be drawn from the record. Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012). However, agencies act contrary to law if their decision-making is not reasoned. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167−68 (1962).

Court No. 20-00146

Here, the Government asserts that this case is distinguishable from prior cases where the court did not find a PMS existed because in this case, "even if the four factors are the same, the underlying evidence on the record is different, and Commerce demonstrated that it considered the more expansive evidence." Def.'s Br. at 17. Plaintiffs disagree, arguing that none of the four factors are adequately supported by record evidence. Pls.' Br. at 13–21. The court concludes that there is not substantial evidence that the four factors considered by Commerce contributed to a PMS either individually or cumulatively. Although Commerce may in theory be able to determine the existence of a PMS based on the totality of the circumstances, or even on the individual factors alleged here, Commerce has failed to present sufficient evidence for either such determination. The court therefore declines to depart from its prior decisions rejecting Commerce's PMS determination on the bases set forth here.

First, the court concludes that substantial evidence does not support a determination that the overcapacity of the Chinese steel market resulted in a PMS in Korea with respect to HRC. The Government argues that Commerce expressly considered "ample evidence" in support of the effect of overcapacity in Chinese steel production on Korean HRC prices, but neither the Government nor Commerce provide an explanation of how overcapacity distorted the Korean market beyond noting the Korean government's subsidization of HRC. Def.'s Br. at 17; IDM at 19–20. However, Korean HRC subsidies are already one of the four factors allegedly contributing to a PMS in this case, so Commerce fails to provide any evidence that steel overcapacity independently contributed to a PMS during the POR. In addition, Plaintiffs, citing prior CIT cases, counter that the court should reject Commerce's determination that overcapacity in the Chinese steel industry contributed to a PMS in Korea because Commerce failed to show that Korean HRC prices were inconsistent with global market prices. Pls.' Br. at 18–20. Since the overcapacity of steel impacts

Court No. 20-00146

all markets, Plaintiffs argue that any resulting distortion is not particular to Korea.  Id.  In its IDM,

Commerce contends that overcapacity manifests itself differently in different markets, but again

provides no further explanation for its determination that Chinese steel overcapacity resulted in a

PMS with respect to Korean HRC.  IDM at 19–20.  Accordingly, the court finds that Commerce

has not adequately demonstrated that steel overcapacity itself contributed to the existence of a

PMS in Korea during the POR.

Next, the court concludes that there is not substantial evidence that domestic HRC

subsidies created or contributed to a PMS in Korea.  In evaluating the potential impact of Korean

HRC subsidies, Plaintiffs allege that Commerce failed to demonstrate that Korean HRC subsidies

actually distorted HRC prices during the POR.  Pls.' Br. at 14–15.  While Commerce offers

evidence that the mandatory respondents purchased HRC from subsidized companies, it provides

no support for its conclusion that the prices were distorted.  IDM at 15.  Plaintiffs further note that

Commerce has previously determined that the applicable Korean government subsidy rates for

HRC were 0.54 percent and 0.58 percent, which Plaintiffs argue would have had a negligible effect

on the market for HRC.  Pls.' Reply Br. at 6–7 (citing Certain Hot-Rolled Steel Flat Products from

Korea, 84 Fed. Reg. 28,461 (Dep't Commerce June 19, 2019) as amended by 84 Fed. Reg. 35,604

(Dep't Commerce July 24, 2019)).  While the Government contends that Commerce does not have

to demonstrate the downstream effects of a subsidy because it is measuring the distortions in the

HRC market as a whole, and Korean HRC subsidies merely contribute to a larger PMS, this

argument is unavailing.  Def.'s Br. at 18 (citing IDM at 19).  As Plaintiffs note, the countervailing

duty statute requires Commerce to prove, not assume, that upstream subsidies affect downstream

prices, and no provision exists under the anti-dumping statute that would authorize Commerce to

assume a competitive benefit here.  Pls.' Reply Br. at 7–9; see 19 U.S.C. § 1677–1(b)(1).  Given

Court No. 20-00146

the evidence that Commerce has previously calculated negligible subsidies for HRC, and further given Commerce's failure to demonstrate any downstream effects of the alleged subsidy, the court concludes that Commerce has not adequately shown that Korean HRC subsidies individually created a PMS in the market or contributed to a broader PMS during the POR.

Nor is the court persuaded that substantial evidence supports Commerce's finding that control of electricity prices by the Korean government resulted in distortion contributing to a PMS. In Nexteel I, this court rejected Commerce's claim that Korean government control over electricity created a PMS such that producers of HRC were charged prices that were outside the ordinary course of trade. 355 F. Supp. 3d at 1351. In the present case, Commerce appears to conflate subsidized prices with distorted prices. The IDM concludes that "simply because the Korean industrial electricity prices reported by the International Electricity Agency are comparable to other countries is not evidence that those rates are not subsidized." IDM at 17. However, Commerce cannot merely show that electricity prices were subsidized; Commerce must show that the prices were outside the ordinary course of trade. See 19 U.S.C. § 1677(15). While Commerce indicated that record evidence supports a conclusion that prices were distorted during the POR, it failed to provide a further explanation for or citation to this evidence. IDM at 17. Accordingly, the court concludes that substantial evidence does not support either a determination that Korean government control of electricity prices created a PMS individually, or that electricity prices apparently comparable to those available in the ordinary course of trade have contributed to a PMS cumulatively.

Finally, the court concludes that Commerce has failed to provide substantial evidence for its determination that strategic alliances between Korean HRC and HWR manufacturers contributed to the existence of a PMS in Korea. While Commerce acknowledged that strategic

Court No. 20-00146

alliances could not support a PMS determination individually, it nevertheless concluded that they supported the existence of a PMS under a totality of the circumstances test. IDM at 15–16. Commerce specifically concluded that "strategic alliances and price fixing schemes are prevalent in the Korean market, may have created distortions in the prices of HRC in the past, and may continue to impact HRC pricing in a distortive manner during the instant POR." IDM at 16. However, as Plaintiffs note, Commerce's conclusions were based on a prior bid-rigging scheme that occurred before the POR and did not involve the sale of HRC or any other HWR input. IDM at 16; Pls.' Br. at 15–16. The court agrees with Plaintiffs and finds that the support for Commerce's conclusions does not amount to "substantial evidence" that strategic alliances in Korea create a PMS individually. Rather, it is at best a speculative allegation that strategic alliances *may* have impacted HRC pricing during the POR for purposes of a cumulative assessment.

Ultimately, the court concludes that Commerce has not identified substantial evidence on the record suggesting that any of the four factors constitute a PMS individually or cumulatively. Indeed, Commerce's totality of the circumstances analysis appears to be supported by negligible Korean HRC subsidies and speculative evidence that strategic alliances "may" have an impact on Korean HRC pricing, combined with unsupported conclusions that Korean electricity prices are distorted and that Chinese steel production overcapacity resulted in a market situation particular to Korea. Cumulatively, this does not amount to "substantial evidence" that a PMS existed with respect to the Korean HRC market. Consistent with prior CIT decisions, the court here rejects Commerce's PMS determination.

### III.    *Commerce's Adjustment on HRC Was Not Reasonable or Supported by Substantial Evidence*

Finally, even if Commerce's pre-test PMS adjustment was permitted by law, and the factors highlighted by Commerce substantiated the existence of a PMS, Commerce's adjustment to HRC

Court No. 20-00146

input costs was not supported by substantial evidence.  As discussed above, Commerce applied an

upward adjustment to HRC input costs prior to conducting a sales-below-cost test to calculate

home market value.  In so doing, Commerce relied on a regression model to quantify the effects

of the PMS on the HRC market and calculate the appropriate upward adjustment.[8]  Def.'s Br. at

22–23.  Plaintiffs allege that the regression model adopted by Commerce is unsupported by

substantial evidence.  Pls.' Br. at 24–32.  In relevant part, Plaintiffs argue that Commerce

unreasonably employed data on HRC costs from 2017 when two-thirds of the POR falls within

2018.  Id. at 30–31.  The Government responds that it was appropriate for Commerce to use data

on input costs from 2017 rather than 2018, even though most of the POR fell in 2018, because

using 2018 data would reflect costs and sales that occurred after the POR.  Def.'s Br. at 28–29.

The Government further argues that while the regression model may be imperfect, Commerce

nevertheless correctly determined that it was a reasonable method to quantify the PMS based on

record evidence.  Def.'s Br. at 25–26.  The court is persuaded by Plaintiffs' argument, and

accordingly declines to sustain Commerce's calculation of the PMS adjustment.[9]

---

[8] Regression models quantify the relationship between variables.  See Def.'s Br. at 23.  The coefficients in a regression model represent the change in the dependent variable attributable to an increase or decrease in the corresponding independent variable.  Id.  Here, Commerce adopted Petitioners' proposed regression model that quantifies the relationship between average unit imported values ("AUVs") for HRC, the dependent variable, and certain "explanatory" or independent variables, including uneconomic capacity (deviations from normal capacity levels), exchange rates, gross fixed capital formation, and prices for iron ore, scrap, and aluminum.  IDM at 36, 44.  Commerce then replaced the actual data for uneconomic capacity with counterfactual data for uneconomic capacity based on a scenario where there was a higher capacity utilization rate in the steel industry to predict what the AUV for HRC *would have been* if there were no PMS distorting the market.  IDM at 38.  Commerce ultimately concluded that a 25.61 percent upward adjustment on HRC prices was appropriate to account for the effects of a PMS on input costs of HWR.  IDM at 46.

[9] Plaintiffs make two additional arguments for the rejection of Commerce's PMS adjustment: (1) that the regression analysis is based on a false assumption that the relationship between the HRC AUVs and various independent variables remains stable over time; and (2) that Commerce's

Court No. 20-00146

As has been noted, agency determinations must be supported by substantial evidence. <u>Atl.</u> <u>Sugar, Ltd.</u>, 744 F.2d at 1559. Commerce must also examine the record and provide an adequate explanation for its findings such that the record demonstrates a rational connection between the facts accepted and the determination made. <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43; <u>Jindal</u> <u>Poly Films Ltd.</u>, 365 F. Supp. 3d at 1383. Here, the POR began in September 2017 and concluded in August 2018. IDM at 36; Pls.' Br. at 30–31. Commerce justified its use of 2017, rather than 2018, data for input costs on the grounds that using 2018 data would include data from the four months of 2018 that were not part of the review period. IDM at 36. However, as Plaintiffs argue, using data from 2017 includes data from eight months of 2017 that were also not part of the review period. IDM at 36; Pls.' Br. at 31. Using data from 2017, which represents input costs for one-third of the review period, as opposed to 2018 data, which represents inputs costs from two-thirds of the review period, is neither reasonable nor supported by substantial evidence. Accordingly, the court rejects Commerce's use of 2017 data in its calculation of input costs and declines to sustain Commerce's calculation of the PMS adjustment based on the regression model.

---

reliance on data from 2008–2017 to populate the model resulted in unreasonable distortion. Pls.' Br. at 25–26, 32. While the court need not address these additional arguments in detail, neither is persuasive. First, the record adequately explains that any apparent instability in the relationship between steel cost and the explanatory variables is the result of errors in constructing and populating alternative models. <u>See</u> Pet'rs' Rebuttal Br. at 64–66. Second, while a regression model employing data from 2008–2017 is slightly less accurate than one employing data from 2013–2017, analysis of the two models indicates that the difference is negligible. <u>See</u> HiSteel NFI Rebuttal at 34, June 24, 2020, P.R. 391–394, C.R. 210–214. The court therefore finds that Commerce's use of the 2008–2017 data does not violate its obligation to employ an adjustment calculation methodology which is reasonable and supported by the record evidence. <u>See</u> <u>Hyundai</u> <u>Steel Co.</u>, 415 F. Supp. 3d 1293, 1297 (2019) ("Commerce has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation."); <u>see also</u> <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 48–49.

Court No. 20-00146

## CONCLUSION

The court concludes that Commerce cannot apply a PMS adjustment prior to conducting a sales-below-cost test when calculating home market value.  Furthermore, even if Commerce could have applied a PMS adjustment in this case, it did not provide substantial evidence that a PMS distorted the market for HRC during the POR.  Finally, the court concludes that Commerce fails to provide substantial evidence to support its methodology for calculating a PMS adjustment.  For the foregoing reasons, the court grants Plaintiffs' motion for judgment on the agency record, and remands Commerce's determination that a PMS affected the price of hot-rolled steel coils during the POR and resultant application of an upward adjustment to the price of HRC prior to conducting a sales-below-cost test.  Commerce shall file with this court and provide to the parties its remand results within ninety (90) days of the date of this order; thereafter, the parties shall have thirty (30) days to submit briefs addressing the revised final determination to the court, and the parties shall have fifteen (15) days thereafter to file reply briefs with the court.

**SO ORDERED.**

*/s/  Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  September 23, 2021
New York, New York